## STARK et al. *v.* WICKARD, SECRETARY OF AGRICULTURE, et al.

No. 211.   Argued January 14, 1944.—Decided February 28, 1944.

*Mr. Edward B. Hanify,* with whom *Messrs. H. Brian Holland* and *Harry Polikoff* were on the brief, for petitioners.

*Mr. Paul A. Freund,* with whom *Solicitor General Fahy, Assistant Attorney General Berge,* and *Messrs. Charles H. Weston* and *J. Stephen Doyle* were on the brief, for respondents.

*Messrs. Reuben Hall* and *Charles W. Wilson* filed a brief on behalf of the New England Milk Producers' Association, as *amicus curiae,* urging affirmance.

MR. JUSTICE REED delivered the opinion of the Court.

This class action was instituted in the United States District Court for the District of Columbia, to procure an injunction prohibiting the respondent Secretary of Agriculture from carrying out certain provisions of his Order No. 4, effective August 1, 1941, dealing with the marketing of milk in the Greater Boston, Massachusetts, area. See Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U. S. C. §§ 601 *et seq.,* and Order 4, United States Department of Agriculture, Surplus Marketing Administration, Title 7, Code of Federal Regulations, Part 904. The district court dismissed the suit for failure to state a claim upon which relief can be granted, and its judgment was affirmed by the Court of Appeals for the District of Columbia, 136 F. 2d 786. The respondent War Food Administrator was joined in this Court upon a showing that he had been given powers concurrent with those of the Secretary. See Executive Order No. 9334, filed April 23, 1943, 8 F. R. 5423, 5425. We granted certiorari because of the importance of the question to the administration of this Act. 320 U. S. 723.

The petitioners are producers of milk, who assert that by §§ 904.7 (b) (5) and 904.9 of his Order, the Secretary is unlawfully diverting funds that belong to them. The courts below dismissed the action on the ground that the Act vests no legal cause of action in milk producers, and since the decision below and the argument here were lim-

ited to that point, we shall confine our consideration to it.

The district court for the District of Columbia has a general equity jurisdiction authorizing it to hear the suit;[1] but in order to recover, the petitioners must go further and show that the act of the Secretary amounts to an interference with some legal right of theirs.[2] If so, the familiar principle that executive officers may be restrained from threatened wrongs in the ordinary courts in the absence of some exclusive alternative remedy will enable the petitioners to maintain their suit; but if the complaint does not rest upon a claim of which courts take cognizance, then it was properly dismissed. The petitioners place their reliance upon such rights as may be expressly or impliedly created by the Agricultural Marketing Agreement Act of 1937 and the Order issued thereunder.

Although this Court has previously reviewed the provisions of that statute at length and upheld its constitutionality,[3] some further reference to it is necessary to an understanding of the producer's interest in the funds dealt with by the Order.[4]

---

[1] See 18 D. C. Code § 41, as amended, 49 Stat. 1921. The District of Columbia court may also exercise the same jurisdiction of United States district courts generally, 18 D. C. Code § 43, which have jurisdiction under the Judicial Code over cases arising under acts regulating interstate commerce. Judicial Code, § 24 (8), 28 U. S. C. § 41 (8); *Mulford* v. *Smith*, 307 U. S. 38; *Turner Lumber Co.* v. *Chicago, M. & St. P. Ry. Co.*, 271 U. S. 259; *Robertson* v. *Argus Hosiery Mills*, 121 F. 2d 285.

[2] See *Tennessee Power Co.* v. *T. V. A.*, 306 U. S. 118, 137–8.

[3] See *United States* v. *Rock Royal Co-op.*, 307 U. S. 533; *H. P. Hood & Sons* v. *United States*, 307 U. S. 588.

[4] The following clauses of the Act are necessary to a consideration of this case:

"Sec. 2. It is hereby declared to be the policy of Congress—

"(1) Through the exercise of the powers conferred upon the Secretary of Agriculture under this title, to establish and maintain such orderly marketing conditions for agricultural commodities in inter-

The immediate object of the Act is to fix minimum prices for the sale of milk by producers to handlers. It does not forbid sales at prices above the minimum. It contains

state commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period; and, in the case of all commodities for which the base period is the pre-war period, August 1909 to July 1914, will also reflect current interest payments per acre on farm indebtedness secured by real estate and tax payments per acre on farm real estate, as contrasted with such interest payments and tax payments during the base period. The base period in the case of all agricultural commodities except tobacco and potatoes shall be the pre-war period, August 1909–July 1914. In the case of tobacco and potatoes, the base period shall be the post-war period, August 1919–July 1929.

"(2) To protect the interest of the consumer by (a) approaching the level of prices which it is declared to be the policy of Congress to establish in subsection (1) of this section by gradual correction of the current level at as rapid a rate as the Secretary of Agriculture deems to be in the public interest and feasible in view of the current consumptive demand in domestic and foreign markets, and (b) authorizing no action under this title which has for its purpose the maintenance of prices to farmers above the level which it is declared to be the policy of Congress to establish in subsection (1) of this section."

"Sec. 8a (5) Any person willfully exceeding any quota or allotment fixed for him under this title by the Secretary of Agriculture, and any other person knowingly participating, or aiding, in the exceeding of said quota or allotment, shall forfeit to the United States a sum equal to three times the current market value of such excess, which forfeiture shall be recoverable in a civil suit brought in the name of the United States.

"(6) The several district courts of the United States are hereby vested with jurisdiction specifically to enforce, and to prevent and restrain any person from violating any order, regulation, or agreement, heretofore or hereafter made or issued pursuant to this title, in any proceeding now pending or hereafter brought in said courts.

"(7) Upon the request of the Secretary of Agriculture, it shall be the duty of the several district attorneys of the United States, in their respective districts, under the directions of the Attorney General, to institute proceedings to enforce the remedies and to collect the for-

feitures provided for in, or pursuant to, this title. Whenever the Secretary, or such officer or employee of the Department of Agriculture as he may designate for the purpose, has reason to believe that any handler has violated, or is violating, the provisions of any order or amendment thereto issued pursuant to this title, the Secretary shall have power to institute an investigation and, after due notice to such handler, to conduct a hearing in order to determine the facts for the purpose of referring the matter to the Attorney General for appropriate action.

"(8) The remedies provided for in this section shall be in addition to, and not exclusive of, any of the remedies or penalties provided for elsewhere in this title or now or hereafter existing at law or in equity.

"(9) The term 'person' as used in this title includes an individual, partnership, corporation, association, and any other business unit."

"SEC. 8c (3) Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this title with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of and an opportunity for a hearing upon a proposed order.

"(4) After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this title with respect to such commodity.

"(5) In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.

"(B) Providing:

(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk

delivered by them: Provided, That, except in the case of orders covering milk products only, such provision is approved or favored by at least three-fourths of the producers who, during a representative period determined by the Secretary of Agriculture, have been engaged in the production for market of milk covered in such order or by producers who, during such representative period, have produced at least three-fourths of the volume of such milk produced for market during such period; the approval required hereunder shall be separate and apart from any other approval or disapproval provided for by this section; or

(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered;

subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk during a representative period of time.

"(C) In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection (5), providing a method for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) hereof."

.          .          .          .          .

Among the provisions of subsection (7), referred to in § 8c (5), is authorization for terms described as follows:

"SEC. 8c (7) (D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6), and (7) and necessary to effectuate the other provisions of such order."

Sections 8c (8) and 8c (9) provide, with exceptions not here relevant that a marketing order must have the approval of the handlers of at least 50% of the volume of the commodity subject to the order unless the Secretary, with the approval of the President, determines that the proposed order is necessary to effectuate the declared policy of the Act and "is the only practical means of advancing the interests of the producers of such commodity pursuant to the declared policy. . . ." § 8c (9) (B). Whether the handlers agree or not, an order must be

found to be "approved or favored" either by two-thirds of the producers in number or by volume of the commodity produced. Section 8c (19) authorizes the Secretary to hold a referendum to determine whether producers approve.

"Sec. 8c (13) (B) No order issued under this title shall be applicable to any producer in his capacity as a producer."

"Sec. 8c (14) Any handler subject to an order issued under this section, or any officer, director, agent, or employee of such handler, who violates any provision of such order (other than a provision calling for payment of a pro rata share of expenses) shall, on conviction, be fined not less than $50 or more than $500 for each such violation, and each day during which such violation continues shall be deemed a separate violation: Provided, That if the court finds that a petition pursuant to subsection (15) of this section was filed and prosecuted by the defendant in good faith and not for delay, no penalty shall be imposed under this subsection for such violations as occurred between the date upon which the defendant's petition was filed with the Secretary, and the date upon which notice of the Secretary's ruling thereon was given to the defendant in accordance with regulations prescribed pursuant to subsection (15)."

"Sec. 8c (15) (A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.

"(B) The District Courts of the United States (including the Supreme Court of the District of Columbia) in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within twenty days from the date of the entry of such ruling. Service of process in such proceedings may be had upon the Secretary by delivering to him a copy of the bill of complaint. If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the Secretary with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to

an appropriate declaration of policy,[5] and it provides that the Secretary of Agriculture shall hold a hearing when he has reason to believe that a marketing order would tend to effectuate the purposes of the Act.[6]  If he finds that an order would be in accordance with the declared policy, he must then issue it.[7]  Sections 8c (5) and 8c (7) enumerate the provisions that the order may contain. Section 8c (5) (A) authorizes the Secretary to classify milk in accordance with the form or purpose of its use, and to fix minimum prices for each classification.  These minima are the use value of the milk.  This method of fixing prices was adopted because the economic value of milk depends upon the particular use made of it.[8]  It is apparent that serious inequities as among producers might arise if the prices each received depended upon the use the handler might happen to make of his milk; accordingly, § 8c (5) (B) authorizes provision to be made for the payment to producers of a uniform price [9] for the milk delivered irrespective of the use to which the milk is put by the individual handler.  Section 8c (5) (C) authorizes the Secretary to set up the necessary machinery to accomplish these purposes.

---

take such further proceedings as, in its opinion, the law requires.  The pendency of proceedings instituted pursuant to this subsection (15) shall not impede, hinder, or delay the United States or the Secretary of Agriculture from obtaining relief pursuant to section 8a (6) of this title.  Any proceedings brought pursuant to section 8a (6) of this title (except where brought by way of counterclaim in proceedings instituted pursuant to this subsection (15)) shall abate whenever a final decree has been rendered in proceedings between the same parties, and covering the same subject matter, instituted pursuant to this subsection (15)."

[5] § 2, n. 4, *supra*.

[6] § 8c (3), n. 4, *supra*.

[7] § 8c (4), n. 4, *supra*.

[8] See *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 549–50.

[9] "Uniform price" means weighted average of minimum prices.

By Order No. 4,[10] the Secretary of Agriculture did fix minimum prices for each class of milk and required each

[10] The preamble to the order recites the holding of hearings and compliance with § 8c (9) of the Act. Section 904.0 of the Order contains the Secretary's findings and § 904.1 the definitions of terms.

"SEC. 904.1 (6) The term 'handler' means any person, irrespective of whether such person is a producer or an association of producers, wherever located or operating, who engages in such handling of milk, which is sold as milk or cream in the marketing area, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects interstate or foreign commerce, in milk and its products."

Section 904.2 enumerates the duties of the market administrator. Section 904.3 classifies milk into Class I milk and Class II milk according to its utilization. Generally speaking, Class I milk is that which is utilized for sale as milk containing from $\frac{1}{2}$ of 1% to 16% butterfat or as chocolate or flavored milk, while Class II includes all other uses.

Section 904.4 provides:

"SEC. 904.4. MINIMUM PRICES. (a) *Class I prices to producers.* Each handler shall pay producers, in the manner set forth in Sec. 904.8, for Class I milk delivered by them, not less than the following prices:

.        .        .        .        .

"(b) *Class II prices.* Each handler shall pay producers, in the manner set forth in Sec. 904.8, for Class II milk delivered by them not less than the following prices per hundredweight: . . ."

Section 904.5 provides for necessary informational reports by handlers, and § 904.6 deals with the application of the Order to exceptional types of handlers. Section 904.7, dealing with computation of the weighted average, read in its applicable portions as of July 28, 1941, as follows:

"SEC. 904.7. DETERMINATION OF UNIFORM PRICES TO PRODUCERS. (a) *Computation of value of milk for each handler.* For each delivery period the market administrator shall compute . . . the value of milk sold, distributed, or used by each handler . . . in the following manner:

"(1) Multiply the quantity of milk in each class by the price applicable pursuant to paragraphs (a), (b), and (c), of Sec. 904.4; and

"(2) Add together the resulting value of each class.

"(b) *Computation and announcement of uniform prices.* The market administrator shall compute and announce the uniform prices

handler in the Boston area to pay not less than those minima to producers, 7 C. F. R. 1941 Supp., § 904.4, less

per hundredweight of milk delivered during each delivery period in the following manner:

"(1) Combine into one total the respective values of milk, computed pursuant to paragraph (a) of this section, for each handler from whom the market administrator has received at his office, prior to the 11th day after the end of such delivery period, the report for such delivery period and the payments required by Sec. 904.8 (b) (3) and (g) and (h) for milk received during each delivery period since the effective date of the most recent amendment hereof;

. . . . .

"(4) Subtract the total amount to be paid to producers pursuant to Sec. 904.8 (b) (2);

"(5) Subtract the total of payments required to be made for such delivery period pursuant to Sec. 904.9 (b);

"(6) Divide by the total quantity of milk which is included in these computations. . . .

"(7) Subtract not less than 4 cents nor more than 5 cents for the purpose of retaining a cash balance in connection with the payments set forth in Sec. 904.8 (b) (3);

. . . . .

"(9) On the 12th day after the end of each delivery period, mail to all handlers and publicly announce (a) such of these computations as do not disclose information confidential pursuant to the act, (b) the blended price per hundredweight which is the result of these computations, (c) the names of the handlers whose milk is included in the computations, and (d) the Class II price."

As of October 28, 1941, Subsection (5) was revoked and the subsections following it were renumbered, and the deduction theretofore required by it was effected by amending Subsection (7) (new Subsection (6)) to read as follows:

"(6) Subtract not less than 5½ cents nor more than 6½ cents for the purpose of retaining a cash balance in connection with the payments set forth in §§ 904.8 (b) (3) and 909.9 (b);"

See n. 16, infra.

Section 904.8 (a) and (b), dealing with the method of making payment, reads:

"SEC. 904.8 PAYMENTS FOR MILK. (a) Advance payments. On or before the 10th day after the end of each delivery period, each handler shall make payment to producers for the approximate value of milk

specified deductions. §§ 904.7 (b), 904.8. In addition, the order exercised the authority granted by the statute to

received during the first 15 days of such delivery period. In no event shall such advance payment be at a rate less than the Class II price for such delivery period.

"(b) *Final payments.* On or before the 25th day after the end of each delivery period, each handler shall make payment, subject to the butterfat differential set forth in paragraph (d) of this section, for the total value of milk received during such delivery period as required to be computed pursuant to Sec. 904.7 (a), as follows:

"(1) To each producer, except as set forth in subparagraph (2) of this paragraph at not less than the blended price per hundredweight, computed pursuant to Sec. 904.7 (b), subject to the differentials set forth in paragraph (e) of this section, for the quantity of milk delivered by such producer;

"(2) To any producer, who did not regularly sell milk for a period of 30 days prior to February 9, 1936, to a handler or to persons within the marketing area, at not less than the Class II price in effect for the plant at which such producer delivered milk, except that during the May, June, and September delivery periods the price pursuant to Sec. 904.4 (b) (3) shall apply, for all the milk delivered by such producer during the period beginning with the first regular delivery of such producer and continuing until the end of 2 full calendar months following the first day of the next succeeding calendar month; and

"(3) To producers, through the market administrator, by paying to, on or before the 23rd day after the end of each delivery period, or receiving from the market administrator on or before the 25th day after the end of each delivery period, as the case may be, the amount by which the payments required to be made pursuant to subparagraphs (1) and (2) of this paragraph are less than or exceed the value of milk as required to be computed for such handler pursuant to Sec. 904.7 (a), as shown in a statement rendered by the market administrator on or before the 20th day after the end of such delivery period."

⋅        ⋅        ⋅        ⋅        ⋅

*Other clauses of § 904.8 deal with price differentials not here pertinent.*

Section 904.9 authorizes the payments to cooperatives which are questioned here. Eligibility requirements are set out in § 904.9 (a), which then provides:

"(1) Any such cooperative association shall receive an amount computed at not more than the rate of 1½ cents per hundredweight

require the use of a weighted average in reaching the uniform price to be paid producers, as described in the preceding paragraph. §§ 904.7, 904.8.

of milk marketed by it on behalf of its members in conformity with the provision of this order, the value of which is determined pursuant to Sec. 904.7 (a), and with respect to which a handler has made payments as required by Sec. 904.8 (b) (3) and Sec. 904.10: *Provided,* That the amount paid shall not exceed the amount which handlers are obligated to deduct from payments to members under subsection (e) hereof and are not used in paying patronage dividends or other payments to members with respect to milk delivered except in fulfilling the guarantee of payments to producers; and that in cases where two or more associations participate in the marketing of the same milk, payment under this paragraph shall be available only to the association which the individual producer has made his exclusive agent in the marketing of such milk.

"(2) Any such cooperative association shall receive an amount computed at the rate of 5 cents per hundredweight on Class I milk received from producers at a plant operated under the exclusive control of member producers, which is sold to proprietary handlers. This amount shall not be received on milk sold to stores, to handlers, in which the cooperative has any ownership, or to a handler with which the cooperative has such sales arrangements that its milk not sold as Class I milk to such handler is not available for sale as Class I milk to other handlers."

Section 904.9 (b) contains the direction for payment out of the cash balance created by § 904.7 (b) (6), as amended, *supra.*

Section 904.9:

"(b) PAYMENT TO QUALIFIED COOPERATIVE ASSOCIATIONS. The market administrator shall, upon claim submitted in form as prescribed by him, make payments authorized under paragraph (a), or issue credit therefor out of the cash balance credited pursuant to Sec. 904.7 (b) (5), on or before the 25th day after the end of each delivery period, subject to verification of the receipts and other items on which the amount of such payment is based."

The deductions from payments by handlers to cooperative member producers, referred to in § 904.9 (a) (1), quoted *supra,* are authorized by § 904.9 (e), as follows:

"(e) *Authorized member deductions.* In the case of producers whose milk is received at a plant not operated by a cooperative association of which such producers are members and which is receiving payments

Under the Order, the handler does not make final settlement with the producer until the blended price [11] has been set, although he must make a part payment on or before the tenth of each month.  § 904.8.  But within eight days after the end of each calendar month—the so-called "delivery period," § 904.1 (9)—the handler must report his sales and deliveries, classified by use value, § 904.5, to a "market administrator."  § 904.1 (8).  On the basis of these reports, the administrator computes the blended price and announces it on the twelfth day following the end of the delivery period.  § 904.7 (b).  On the twenty-fifth day, the handlers are required to pay the balance due of the blended price so fixed to the producers.  § 904.8 (b).

Were no administrative deductions necessary, the blended price per hundredweight of milk could readily be determined by dividing the total value of the milk used in the marketing area at the minimum prices for each classification by the number of hundredweight of raw milk used in the area.[12]  However, the Order requires several adjustments for purposes admittedly authorized by statute, so that the determination of the blended price as actually made is drawn from the total use value less a sum which the administrator is directed to retain to meet various incidental adjustments.[13]  In practice, each handler

---

pursuant to this section, each handler shall make such deductions from the payments to be made to such producers pursuant to Sec. 904.8 as may be authorized by such producers and, on or before the 25th day after the end of each delivery period, pay over such deductions to the association in whose favor such authorizations were made."

Section 904.10 requires each handler to pay to the market administrator not more than 2 cents per hundredweight of milk delivered to him in order to meet costs of administration.  Section 904.11 covers the effective time, suspension, or termination of the order.

[11] "Blended price" means the uniform price less administrative deductions.

[12] Cf. 7 C. F. R. 1941 Supp. § 904.7 (a).

[13] See 7 C. F. R. 1941 Supp. § 904.7 (b).

discharges his obligation to the producers of whom he bought milk by making two payments: one payment, the blended price, is apportioned from the values at the minimum price for the respective classes less administrative deductions and is made to the producer himself; [14] the other payment is equal to these deductions and is made, in the language of the Order, "to the producer, through the market administrator," in order to enable the administrator to cover the differentials and deductions in question.[15] It is the contention of the petitioners that by § 904.7 (b) (6)[16] of the Order the Secretary has directed the administrator to deduct a sum for the purpose of meeting payments to cooperatives as required by § 904.9, and that the Act does not authorize the Secretary to include in his order provision for payments of that kind or for deductions to meet them. Apparently, this deduction for payments to cooperatives is the only deduction that is an unrecoverable charge against the producers. The other items deducted under § 904.7 (b) are for a revolving fund or to meet differentials in price because of location, seasonal delivery, *et cetera*.

These producer petitioners allege that they have delivered milk to handlers in the "Greater Boston," Massachusetts, marketing area under the provisions of the Order. They state that they are not members of a cooperative association entitled under the Order to the contested payments and that, as producers, many of them voted against the challenged amendment on the producers' referendum under §§ 8c (9) and 8c (19) of the Act. These allegations

---

[14] 7 C. F. R. 1941 Supp. §§ 904.7 (b), 904.8 (b) (1).

[15] 7 C. F. R. 1941 Supp. § 904.8 (b) (3). The operations of the settlement fund are described in *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 571.

[16] This section has superseded § 904.7 (b) (5) in effect at the time this suit was brought with reference to the deduction in issue. 6 F. R. 5482, effective October 28, 1941. See n. 10, *supra*.

are admitted by the defense upon which dismissal was based, namely, that the petition fails to state a claim upon which relief could be granted. From the preceding summary of the theory and plan of the statutory regulation of minimum prices for milk affecting interstate commerce, it is clear that these petitioners have exercised the right granted them by the statute and Order to deliver their milk to "Greater Boston" handlers at the guaranteed minimum prices fixed by the Secretary of Agriculture in the Order. § 904.4. Upon accepting that delivery the handler was required by the Order to pay to these producers their minimum prices in the manner set forth in § 904.8. Simply stated, this section required the handler to pay directly to the producer the blended price as determined by the administrator and to pay to the producers through the administrator for use in meeting the deductions authorized by the order of the Secretary and approved by two-thirds of the producers, § 8c (9) (b), the difference between the blended price and the minimum price. The Order directed the administrator to deduct from the funds coming into his hands from the producers' sale price the payments to cooperatives. § 904.9.

It is this deduction which the producers challenge as beyond the Secretary's statutory power. The respondents answer that the petitioners have not such a legal interest in this expenditure or in the administrator's settlement fund as entitles them to challenge the action of the Secretary in directing the disbursement. The Government says that as the producers pay nothing into the settlement fund and receive nothing from it, they have no legally protected right which gives them standing to sue. There is, of course, no question but that the challenged deduction reduces *pro tanto* the amount actually received by the producers for their milk.

By the statute and Order, the Secretary has required all area handlers dealing in the milk of other producers to

pay minimum prices as just described. §§ 904.1 (6), 904.4; Act, § 8c (14). The producer is not compelled by the Order to deliver (Act § 8c (13) (B)) but neither can he be required to market elsewhere; and if he finds a dealer in the area who will buy his product, the producer by delivery of milk comes within the scope of the Act and the Order. The Order fixing the minimum price obviously affects by direct Governmental action the producer's business relations with handlers. *Columbia Broadcasting System* v. *United States,* 316 U. S. 407, 422. Cf. *Chicago Junction Case,* 264 U. S. 258, 267. The fact that the producer may sell to the handler for any price above the minimum is not of moment in determining whether or not the statute and Order secure to him a minimum price. Should the producer sell his milk to a handler at prices in excess of the minimum, the handler would nevertheless be compelled to pay into the fund the same amount. The challenged deduction is a burden on every area sale. §§ 904.7 (a), 904.8 (b). In substance petitioners' allegation is that in effect the Order directed without statutory authority a deduction of a sum to pay the United States a sales tax on milk sold. The statute and Order create a right in the producer to avail himself of the protection of a minimum price afforded by Governmental action. Such a right created by statute is mandatory in character and obviously capable of judicial enforcement.[17] For example, the Order could not bar any qualified producers in the milk shed from selling to area handlers. Like the instances just cited

---

[17] *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548, 568; *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515, 545. *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323, and *Switchmen's Union* v. *Mediation Board,* 320 U. S. 297, do not look in the contrary direction. Both assume claims created by statute in the petitioners and deny a judicial remedy to those claims on the ground that "Congress . . . has foreclosed resort to the courts for enforcement of the claims asserted by the parties." 320 U. S. 300 and 327.

from railway labor cases, *supra,* n. 17, the petitioners here voluntarily bring themselves within the coverage of the Act.   It cannot be fairly said that because producers may choose not to sell in the area, those who do choose to sell there necessarily must sell, without a right of challenge, in accordance with unlawful requirements of administrators.   Upon purchase of his milk by a handler, the statute endows the producer with other rights, *e. g.,* the right to be paid a minimum price.   Order, § 904.4.

The mere fact that Governmental action under legislation creates an opportunity to receive a minimum price does not settle the problem of whether or not the particular claim made here is enforcible by the District Court. The deduction for cooperatives may have detrimental effect on the price to producers and that detriment be *damnum absque injuria.*[18]   It is only when a complainant possesses something more than a general interest in the proper execution of the laws that he is in a position to secure judicial intervention.   His interest must rise to the dignity of an interest personal to him and not possessed by the people generally.[19]   Such a claim is of that character which constitutionally permits adjudication by courts under their general powers.[20]

---

[18] *United States* v. *Illinois Central R. Co.,* 244 U. S. 82, 87; *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299, 314–15; *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, 478; *Tennessee Power Co.* v. *T. V. A.,* 306 U. S. 118, 135; *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 125; *Singer & Sons* v. *Union Pacific R. Co.,* 311 U. S. 295, 303.

[19] This distinction has long been recognized.   Chief Justice Marshall phrased it in vivid language as early as *Marbury* v. *Madison,* 1 Cranch 137, 165–66, a fragment only of which follows: "But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy."   *Perkins* v. *Lukens Steel Co.,* 310 U. S 113, 125; *Massachusetts* v. *Mellon,* 262 U. S. 447, 488.

[20] *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 619; *American School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94, 110.

We deem it clear that on the allegations of the complaint these producers have such a personal claim as justifies judicial consideration. It is much more definite and personal than the right of complainants to judicial consideration of their objections to regulations, which this Court upheld in *Columbia Broadcasting System* v. *United States*, 316 U. S. 407. In the present case a reexamination of the preceding statement of facts and summary of the statute and Order will show that delivering producers are assured minimum prices for their milk. § 904.4. The Order directs the handler to pay that minimum as follows:

A. By § 904.8 (a) the handler is to make a preliminary part payment of the blended price and later, § 904.8 (b) (1) the handler makes the final payment to the producer of the blended price computed as the Order directs. It is clear that the Order compels the handler to pay not only the blended price, which is always less than the uniform minimum price, but the entire minimum price, because § 904.8 (b) directs the handler's payment of the entire minimum value as ascertained by § 904.7 (a) (1) and (2). The blended price is reached by subtracting among other items the cooperative payment, here in question, from the minimum price. § 904.7 (b) (5).

B. The balance of the minimum price, which the handler owes to the producer, he must pay "to the producer, through the market administrator" by payment into the settlement or equalization fund two days ahead of the final date for payment of the blended price. § 904.8 (b) (3). This balance of the minimum purchase price is then partly used by the administrator to pay the cooperatives. § 904.9 (b). The handler is simply a conduit from the administrator who receives and distributes the minimum prices. The situation would be substantially the same if an administrator received as trustee for the producers the purchase price of their milk, paid expenses incurred in the

operation, and paid the balance to the producers. Under such circumstances we think the producers have legal standing to object to illegal provisions of the Order.

However, even where a complainant possesses a claim to executive action beneficial to him, created by federal statute, it does not necessarily follow that actions of administrative officials, deemed by the owner of the right to place unlawful restrictions upon his claim, are cognizable in appropriate federal courts of first instance. When the claims created are against the United States, no remedy through the courts need be provided. *United States* v. *Babcock,* 250 U. S. 328, 331, and cases cited; *Work* v. *Rives,* 267 U. S. 175, 181; *Butte, A. & P. Ry. Co.* v. *United States,* 290 U. S. 127, 142, 143. To reach the dignity of a legal right in the strict sense, it must appear from the nature and character of the legislation that Congress intended to create a statutory privilege protected by judicial remedies. Under the unusual circumstances of the historical development of the Railway Labor Act, this Court has recently held that an administrative agency's determination of a controversy between unions of employees as to which is the proper bargaining representative of certain employees is not justiciable in federal courts. *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323. Under the same Act it was held on the same date that the determination by the National Mediation Board of the participants in an election for representatives for collective bargaining likewise was not subject to judicial review. *Switchmen's Union* v. *Mediation Board,* 320 U. S. 297. This result was reached because of this Court's view that jurisdictional disputes between unions were left by Congress to mediation rather than adjudication. 320 U. S. 302 and 337. That is to say, no personal right of employees, enforcible in the courts, was created in the particular instances under consideration. 320 U. S. 337. But where rights of collective bargaining, created by the

same Railway Labor Act, contained definite prohibitions of conduct or were mandatory in form, this Court enforced the rights judicially. 320 U. S. 330, 331. Cf. *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548; *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515.

It was pointed out in the *Switchmen's* case that:

"If the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." 320 U. S. at 300.

The only opportunity these petitioners had to complain of the contested deduction was to appear at hearings and to vote for or against the proposed order. Act, § 8c (3), 8c (9) and 8c (19); Order, preamble. So long as the provisions of the Order are within the statutory authority of the Secretary such hearings and balloting furnish adequate opportunity for protest. *Morgan* v. *United States,* 298 U. S. 468, 480. But where as here the issue is statutory power to make the deduction required by Order, § 904.9, under the authority of § 8c (7) (D) of the Act, a mere hearing or opportunity to vote cannot protect minority producers against unlawful exactions which might be voted upon them by majorities. It can hardly be said that opportunity to be heard on matters within the Secretary's discretion would foreclose an attack on the inclusion in the Order of provisions entirely outside of the Secretary's delegated powers.

Without considering whether or not Congress could create such a definite personal statutory right in an individual against a fund handled by a federal agency, as we have here, and yet limit its enforceability to administrative determination, despite the existence of federal courts of general jurisdiction established under Article III of the Constitution, the Congressional grant of jurisdiction of this proceeding appears plain. There is no

direct judicial review granted by this statute for these proceedings. The authority for a judicial examination of the validity of the Secretary's action is found in the existence of courts and the intent of Congress as deduced from the statutes and precedents as hereinafter considered.

The Act bears on its face the intent to submit many questions arising under its administration to judicial review. §§ 8a (6), 8c (15) (A) and (B). It specifically states that the remedies specifically provided in § 8a are to be in addition to any remedies now existing at law or equity. § 8a (8). This Court has heretofore construed the Act to grant handlers judicial relief in addition to the statutory review specifically provided by § 8c (15). On complaint by the United States, the handler was permitted by way of defense to raise issues of a want of statutory authority to impose provisions on handlers which directly affect such handlers. *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 560–61. In the *Rock Royal* case the Government had contended that the handlers had no legal standing in the suit for enforcement to attack provisions of the order relating to handlers. While we upheld the contention of the Government as to the lack of standing of handlers to object to the operation of the producer settlement fund on the ground that the handlers had no "financial interest" in that fund, we recognized the standing of a proprietary handler to question the alleged discrimination shown in favor of the co-operative handlers. The producer settlement fund is created to meet allowable deductions by the payment of a part of the minimum price to producers through the market administrator. See note 15, *supra*. *Rock Royal* pointed out that handlers were without standing to question the use of the fund, because handlers had no financial interest in the fund or its use. It is because every dollar of deduction comes from the producer that he may challenge the use of the fund. The petitioners' complaint is not

that their blended price is too low, but that the blended price has been reduced by a misapplication of money deducted from the producers' minimum price.

With this recognition by Congress of the applicability of judicial review in this field, it is not to be lightly assumed that the silence of the statute bars from the courts an otherwise justiciable issue, *United States* v. *Griffin,* 303 U. S. 226, 238; *Shields* v. *Utah Idaho R. Co.,* 305 U. S. 177, 182; cf. *A. F. of L.* v. *Labor Board,* 308 U. S. 401, 404, 412. The ruling in *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, is not authority to the contrary. It was there held that the statute placed the power in the Interstate Commerce Commission to hear the complaint stated, not in the state court where it was brought. The Commission award was then to be enforced in court. P. 438. Here, there is no forum, other than the ordinary courts, to hear this complaint. When, as we have previously concluded in this opinion, definite personal rights are created by federal statute, similar in kind to those customarily treated in courts of law,[21] the silence of Congress as to judicial review is, at any rate in the absence of an administrative remedy, not to be construed as a denial of authority to the aggrieved person to seek appropriate relief in the federal courts in the exercise of their general jurisdiction. When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted.[22] This permits the

---

[21] *Tennessee Power Co.* v. *T. V. A.,* 306 U. S. 118, 137.

[22] *Marbury* v. *Madison,* 1 Cranch 137, 165; *American School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94, 109–10; *Interstate Commerce Comm'n* v. *Union Pacific R. Co.,* 222 U. S. 541, 547; *International Ry. Co.* v. *Davidson,* 257 U. S. 506, 514; *Morgan* v. *United States,* 298 U. S. 468, 479; *United States* v. *Carolina Freight Carriers Corp.,* 315 U. S. 475, 489; *Commissioner* v. *Gooch Milling & Elevator Co.,* 320 U. S. 418.

courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers. The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction. Cf. *United States* v. *Morgan,* 307 U. S. 183, 190-91. This is very far from assuming that the courts are charged more than administrators or legislators with the protection of the rights of the people. Congress and the Executive supervise the acts of administrative agents. The powers of departments, boards and administrative agencies are subject to expansion, contraction or abolition at the will of the legislative and executive branches of the government. These branches have the resources and personnel to examine into the working of the various establishments to determine the necessary changes of function or management. But under Article III, Congress established courts to adjudicate cases and controversies as to claims of infringement of individual rights whether by unlawful action of private persons or by the exertion of unauthorized administrative power.

It is suggested that such a ruling puts the agency at the mercy of objectors, since any provisions of the Order may be attacked as unauthorized by each producer. To this objection there are adequate answers. The terms of the Order are largely matters of administrative discretion as to which there is no justiciable right or are clearly authorized by a valid act. *United States* v. *Rock Royal Co-op.,* 307 U. S. 533. Technical details of the milk business are left to the Secretary and his aides. The expenses of litigation deter frivolous contentions. If numerous parallel cases are filed, the courts have ample authority to stay useless litigation until the determination of a test case. Cf. *Landis* v. *North American Co.,* 299 U. S. 248. Should

some provisions of an order be held to exceed the statutory power of the Secretary, it is well within the power of a court of equity to so mold a decree as to preserve in the public interest the operation of the portion of the order which is not attacked pending amendment.

It hardly need be added that we have not considered the soundness of the allegations made by the petitioners in their complaint. The trial court is free to consider whether the statutory authority given the Secretary is a valid answer to the petitioners' contention. We merely determine the petitioners have shown a right to a judicial examination of their complaint.

*Reversed.*

MR. JUSTICE BLACK is of the view that the judgment should be affirmed for the reasons given in the opinion of the United States Court of Appeals for the District of Columbia.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting:

The immediate issue before us is whether these plaintiffs, milk producers, can in the circumstances of this case go to court to complain of an order by the Secretary of Agriculture fixing rates for the distribution of milk within the Greater Boston marketing area. The solution of that question depends, however, upon a proper approach toward such a scheme of legislation as that formulated by Congress in the Agricultural Marketing Agreement Act of 1937.

Apart from legislation touching the revenue, the public domain, national banks and patents, not until the Interstate Commerce Act of 1887 did Congress begin to place economic enterprise under systems of administrative control. These regulatory schemes have varied in the range

of control exercised by government; they have varied no less in the procedures by which the control was exercised. More particularly, these regimes of national authority over private enterprise reveal great diversity in the allotment of power by Congress as between courts and administrative agencies. Congress has not made uniform provisions in defining who may go to court, for what grievance, and under what circumstances, in seeking relief from administrative determinations. Quite the contrary. In the successive enactments by which Congress has established administrative agencies as major instruments of regulation, there is the greatest contrariety in the extent to which, and the procedures by which, different measures of control afford judicial review of administrative action.

Except in those rare instances, as in a claim of citizenship in deportation proceedings, when a judicial trial becomes a constitutional requirement because of "The difference in security of judicial over administrative action," *Ng Fung Ho* v. *White,* 259 U. S. 276, 285, whether judicial review is available at all, and, if so, who may invoke it, under what circumstances, in what manner, and to what end, are questions that depend for their answer upon the particular enactment under which judicial review is claimed. Recognition of the claim turns on the provisions dealing with judicial review in a particular statute and on the setting of such provisions in that statute as part of a scheme for accomplishing the purposes expressed by that statute. Apart from the text and texture of a particular law in relation to which judicial review is sought, "judicial review" is a mischievous abstraction. There is no such thing as a common law of judicial review in the federal courts. The procedural provisions in more than a score of these regulatory measures prove that the manner in which Congress has distributed responsibility for the enforcement of its laws between courts and administrative agencies runs a gamut all the way from authorizing a

judicial trial *de novo* of a claim determined by the administrative agency to denying all judicial review and making administrative action definitive.

Congress has not only devised different schemes of enforcement for different Acts. It has from time to time modified and restricted the scope of review under the same Act. Compare § 16 of the Act to Regulate Commerce, February 4, 1887, c. 104, 24 Stat. 379, 384–385, with § 13 of the Commerce Court Act, June 18, 1910, c. 309, 36 Stat. 539, 554–5, and 49 U. S. C. § 16 (12), and the latter with enforcement of reparation orders, 49 U. S. C § 16 (2). Moreover the same statute, as is true of the Interstate Commerce Act, may make some orders not judicially reviewable for any purpose, see *e. g., United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299, or reviewable by some who are adversely affected and not by others, *e. g., Singer & Sons* v. *Union Pacific R. Co.,* 311 U. S. 295, 305–308. The oldest scheme of administrative control—our customs revenue legislation—shows in its evolution all sorts of permutations and combinations in using available administrative and judicial remedies. See, for instance, *Elliott* v. *Swartwout,* 10 Pet. 137; *Cary* v. *Curtis,* 3 How. 236; *Murray's Lessee* v. *Hoboken Land Co.,* 18 How. 272; *Hilton* v. *Merritt,* 110 U. S. 97; for a general survey, see Freund, *Administrative Powers over Persons and Property,* §§ 260–62. And only the other day we found the implications of the Railway Labor Act (c. 347, 44 Stat. (part 2) 577, as amended, c. 691, 48 Stat. 1185, 45 U. S. C. § 151 *et seq.*) to be such that courts could not even exercise the function of keeping the National Mediation Board within its statutory authority. *Switchmen's Union* v. *Mediation Board,* 320 U. S. 297. Were this list of illustrations extended and the various regulatory schemes thrown into a hotchpot, the result would be hopeless discord. And to do so would be to treat these legislative schemes as though they were part of a single body of law instead of each being a self-contained scheme.

The divers roles played by judicial review in the administration of regulatory measures other than the Agricultural Marketing Act cannot tell us when and for whom judicial review of administrative action can be had under that Act. The fact that certain classes of individuals adversely affected by a ruling of the Interstate Commerce Commission can and other classes cannot obtain redress in court, does not tell us what classes may and what classes may not obtain judicial redress for action by the Secretary of Agriculture which affects these respective classes adversely. And to cite the *Switchmen's* case, *supra,* in support of this case is to treat our decisions too lightly. In the numerous cases either granting or denying judicial review, grant or denial was reached not by applying some "natural law" of judicial review nor on the basis of some general body of doctrines for construing the diverse provisions of the great variety of federal regulatory statutes. Judicial review when recognized—its scope and its incidence—was derived from the materials furnished by the particular statute in regard to which the opportunity for judicial review was asserted. This is the lesson to be drawn from the prior decisions of this Court on judicial review, and not any doctrinaire notions of general applicability to statutes based on different schemes of administration and conveying different purposes by Congress in the utilization of administrative and judicial remedies for the enforcement of law. However useful judicial review may be, it is for Congress and not for this Court to decide when it may be used—except when the Constitution commands it. In this case there is no such command. Common-law remedies withheld by Congress and unrelated to a new scheme for enforcing new rights and duties should not be engrafted upon remedies which Congress saw fit to particularize. To do so impliedly denies to Congress the constitutional right of choice in the selection of reme-

dies, and turns common-law remedies into constitutional necessities simply because they are old and familiar.

When recently the Agricultural Marketing Act was in litigation before us, we sustained its constitutionality and defined its scope in the light of its history, its purposes and its provisions. *United States* v. *Rock Royal Co-op.,* 307 U. S. 533. We held in that case that a milk handler cannot challenge in court such an order as the one which is now assailed. Again we must turn to the history, the purposes and the provisions of the Act to determine whether Congress gave the producer the right of judicial relief here sought.

In 1931 and 1932, prices of manufactured dairy products reached the lowest level in twenty-five years. Because of their relatively weak bargaining position, milk producers suffered most seriously. See Mortenson, *Milk Distribution as a Public Utility,* p. 6; Black, *The Dairy Industry and the AAA,* c. III; *State Milk and Dairy Legislation* (U. S. Gov't Printing Office, 1941) p. 3. Accordingly, Congress decided that the public interest in the handling of milk in interstate commerce could no longer be left to the haggling of a disorderly market, mitigated by inadequate organization within the industry. The Agricultural Adjustment Act of 1933 (c. 25, 48 Stat. 31) was the result. The "essential purpose" of the series of enactments thus initiated was to raise the producer's prices. Sen. Rep. No. 1011, 74th Cong., 3d Sess., p. 3. The Act of 1933 was amended in 1935 (c. 641, 49 Stat. 750), and partially reenacted and amended by the Agricultural Marketing Agreement Act of 1937, with which we are here concerned. c. 296, 50 Stat. 246, c. 567, 50 Stat. 563, 7 U. S. C. § 601 *et seq.*

An elaborate enactment like this, devised by those who know the needs of the industry and drafted by legislative specialists, is to be treated as an organism. Every part

must be related to the scheme as a whole. The legislation is a self-contained code, and within it must be found whatever remedies Congress saw fit to afford. For the Act did not give new remedies for old rights. It created new rights and new duties, and precisely defined the remedies for the enforcement of duties and the vindication of rights. Of course the statute concerns the interests of producers, handlers and consumers. But it does not define or create any legal interest for the consumer, and it specifically provides that "No order issued under this title shall be applicable to any producer in his capacity as producer." § 8c (13) (B).

The statute as an entirety makes it clear that obligations are imposed on handlers alone. Section 8c (5)(A) authorizes the Secretary to classify milk according to the form in which or the purpose for which it is used. Section 8c (5)(B)(ii) directs the Secretary to provide for the payment to producers of a uniform price "irrespective of the uses made of such milk by the individual handler to whom it is delivered." This latter, known as the "blended price," is computed under the Secretary's Order No. 4 of July 28, 1941, by multiplying the use value of the milk by the total quantity, making specified deductions and additions, and then dividing the resulting sum by the total quantity of the milk. § 904.7 (b). A deduction for payments to cooperatives which enters into this computation is the object of petitioner's attack.

It is apparent that the minimum "blended price" which the producer receives may be different than the minimum "use value" fixed by the Secretary or his Administrator which the handler must pay. Thus § 8c (5)(C) authorizes provision for necessary adjustments. The mechanics of these adjustments are described in the Secretary's Order No. 4. In short, the handler who sells or uses his milk so that its value is more than the minimum "blended price" he pays the producer, must pay the excess to a settlement

fund, and the handler who puts his milk to a lower value use than the minimum "blended price" he pays in turn receives the difference out of the fund. § 904.8 (b).

Violation of any order by a handler makes him subject to criminal proceedings. § 8c (14). Thus, while the Act and the Order may affect the interests of producers as well as those of handlers, legally they operate directly against handlers only. The corrective processes provided by the Act reflect this situation. Section 8c (15) permits a handler to challenge an order before the Secretary, and if dissatisfied, he may bring suit in equity before a district court. Provision for judicial remedies for consumers and producers is significantly absent. Such omission is neither inadvertent nor surprising. It would be manifestly incongruous for an Act which specifically provides that no order shall be directed at producers to give to producers the right to attack the validity of such an order in court.

To create a judicial remedy for producers when the statute gave none is to dislocate the Congressional scheme of enforcement. For example, § 8c (15) (B) provides that the pendency of a proceeding for review instituted by a handler shall not impede or delay proceedings brought under § 8a (6) for compliance with an order. Because there is no provision for court review of an order on a producer's position naturally there is no corresponding provision to guard against such interference with enforcement of an order. By giving producers the right to sue although Congress withheld that right, the suspension of a milk order pending disposition of a producer's suit will now depend upon the discretion of trial judges. And technical details concerning the milk industry that were committed to the Secretary of Agriculture are now made subjects of litigation before ill-equipped courts.

By denying them access to the courts Congress has not left producers to the mercy of the Secretary of Agriculture. Congress merely has devised means other than judicial

for the effective expression of producers' interests in the terms of an order. Before the Secretary may issue an order he is required to "give due notice of and an opportunity for a hearing upon a proposed order." § 8c (3). At such a hearing all interested persons may submit relevant evidence, and the procedure makes adequate provision for notice to those who may be affected by an order. See *Administrative Procedure and Practice in the Department of Agriculture under the Agricultural Marketing Agreement Act of 1937* (U. S. Department of Agriculture, 1939), p. 11 *et seq.* Nor are these the only or the most effective means for safeguarding the producer's interest. While an order may be issued despite the objection of handlers of more than 50% of the volume of the commodity covered by the order, no order may issue when not approved by at least two-thirds—either numerically or according to volume of production—of the producers. § 8c (9).

The fact that Congress made specific provision for submission of some defined questions to judicial review would hardly appear to be an argument for inferring that judicial review even of broader scope is also open as to other questions for which Congress did not provide judicial review. The obvious conclusion called for is that as to such other questions, judicial review was purposefully withheld. In the frame of this statute such an omission should not be treated as having no meaning, or rather as meaning that an omission is to be given the same effect as an inclusion. Nor does § 8a (8) referring to remedies "existing at law or in equity" touch our problem. That only adds to the remedies in § 8a (5)–(7) for the enforcement of the Act. It in no way qualifies or expands the express provisions of the statute in § 8c (15) for judicial review of such an order as the present—specification of the class of persons who are given the right to resort to courts and narrow limitation of the scope of judicial review. The remedy of review here sought by producers is by § 8c (15) explicitly

restricted to handlers; and such review is not like that before the Court, a conventional suit in equity, but is a procedure for review of an adverse ruling in a price proceeding before the Secretary of Agriculture. It is a review of an administrative review, not an independent judicial determination.

An elaborate process of implications should not be invented to escape the plain meaning of § 8c (15), and to dislocate a carefully formulated scheme of enforcement. That is not the way to construe such legislation, that is, if Chief Justice Taft was right in characterizing as "a conspicuous instance of his [Chief Justice White's] unusual and remarkable power and facility in statesmanlike interpretation of statute law," 257 U. S. xxv, the doctrine established in *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, and more particularly the way in which § 22 of the Act to Regulate Commerce was therein construed to effectuate the purposes of that Act. 204 U. S. at 446–447.

The Court is thus adding to what Congress has written a provision for judicial relief of producers. And it sanctions such relief in a case in which petitioners have no standing to sue on any theory. The only effect of the deduction which is challenged by the producers is to fix a minimum price to which they are entitled perhaps lower than that which might otherwise have been determined. But the Act does not prevent their bargaining for a price higher than the minimum, and we are advised by the Government of what is not denied by petitioners, that such arrangements are by no means unusual. This Court has held that a consumer has no standing to challenge a minimum price order like the one before us. *Atlanta* v. *Ickes,* 308 U. S. 517; cf. *Sprunt & Son* v. *United States,* 281 U. S. 249. Surely a producer who may bargain for prices above the minimum is in no better legal position than a consumer who urges that too high a minimum has

been improperly fixed. The Commonwealth of Massachusetts which purchased milk for its public institutions valued at $105,232.97 in 1940, and $117,584.50 in 1941, has hardly a less substantial interest in the minimum price than that of the petitioners. And yet Massachusetts has no standing to object to the minimum fixed by an order.

The alleged lower minimum "blended price" is the sum and substance of petitioners' complaint. If that gives them no standing to sue nothing does. An attack merely on the method by which the blended price was reduced may present an interesting abstract question but furnishes no legal right to sue. The producers have nothing to do with the settlement fund. They receive the blended price in any event. Even assuming that the Administrator may have fixed a blended price in ways that may argue an inconsistency between what he has done and what Congress told him to do, any resulting disadvantage to a producer is wholly unrelated to the settlement fund. That fund is contributed by handlers and paid to handlers. If handlers may not attack payments to cooperatives, as this Court held in *United States* v. *Rock Royal Co-op.*, *supra* at 561, with all deference I am unable to see how producers can be in a better position to attack such payments. This suit was rightly dismissed.