**Siegent CAULFIELD, Appellant,**

v.

**U. S. DEPARTMENT OF AGRICULTURE, Agricultural Stabilization & Conservation Committee, Louisiana State Office and Executors of the Succession of W. T. Coats, Deceased, formerly d/b/a Wildwood Plantation, Appellees.**

No. 18429.

United States Court of Appeals
Fifth Circuit.

July 31, 1961.

Rehearing Denied En Banc
Sept. 12, 1961.

J. D. DeBlieux, Baton Rouge, La., for appellant.

Kathleen Ruddell, Asst. U. S. Atty., New Orleans, La., Morton Hollander and Anthony L. Mondello, Attys., Dept. of Justice, Washington, D. C., for appellees.

Before TUTTLE, Chief Judge, HUTCHESON, RIVES, CAMERON, JONES, BROWN and WISDOM, Circuit Judges, en banc.

JOHN R. BROWN, Circuit Judge, joined by HUTCHESON, CAMERON and JONES, Circuit Judges.

This case presents the same basic question as that in Dickson v. Edwards, 5 Cir., 1960, 293 F.2d 211, concerning the availability of judicial review under the Soil Bank Act, 7 U.S.C.A. §§ 1801–1837 (Supp.1959). After the opinion in Dickson was announced on January 13, 1961, the Court, by an order en banc, vacated that opinion and judgment and ordered the two cases resubmitted for reconsideration by the Court en banc. The Court en banc, on such reconsideration, adhered to the prior opinion in Dickson so that it has become the opinion of the Court en banc. The Dickson decision is controlling on the basic issue despite the factual differences in the two cases.

## I.

The complaint here was filed by Caulfield, the Tenant, against two governmental defendants, the Department of Agriculture through the Secretary of Agriculture and the Louisiana State Agricultural Stabilization and Conservation Committee. Also named as a party was the private defendant, the Executors of the succession of W. T. Coats, deceased, the Landowner. The theory of the Tenant's complaint was that in anticipation of making an Acreage Reserve Contract, the Landowner evicted the Tenant prior to the commencement of that crop year in order to avoid sharing the government grant under the ARC Contract. As this is forbidden by the Act, he sought recovery of his share of the payments later made to and received by the Landowner and a trial de novo of the adverse determination by the administrative committees.

The Government on behalf of the two governmental defendants only filed a motion for summary judgment. These papers included the administrative record before the County (Parish) Committee and the State ASC Committee. Thus the matter is broadened beyond the brief allegations of the complaint, F.R.Civ.P. 12(c), 56, 28 U.S.C.A. These undisputed facts [1] may be briefly summarized.

For the crop year 1957 the Tenant was a sharecropper on 18.6 acres of the Wildwood Plantation in Pointe Coupee Parish operated by W. T. Coats, the Landowner. Under the sharecropper agreement, the Tenant was to receive

[1]. The Tenant does not dispute the authenticity of the administrative record or what it *shows*. His contention is the more basic one that on a trial de novo he would be able to prove the actual facts to be different.

¾ths of the revenues from farming operations. In late 1957 the Landowner advised the Tenant that the arrangement would be terminated at the end of that crop year. Thereafter in January 1958 the Landowner as the sole "producer"[2] made an ARC Contract withdrawing these specific 18.6 acres from cotton. Under the ARC Contract the Landowner, as sole producer, was to receive $1,655.-40.[3]

When he belatedly learned from some friends that terminating a tenancy in anticipation of making a Soil Bank Contract was probably a violation of the law by a landowner, the Tenant complained to the Parish (County) Committee. The Landowner's contention was that the tenancy had been voluntarily relinquished when the Tenant gave up farming and sought employment in the city. On appeal the State ASC Committee reached the same conclusion. It is this basic controversy—did the Tenant leave voluntarily or was he evicted?—on which trial de novo was sought under 7 U.S.C.A. § 1831(d).

This brief recitation makes two things clear. First, even if the Tenant were actually a party to an existing ARC Contract and not merely hoped to be, there was no *violation* of such contract by him, nor did either the Parish (County) or State Committee so determine. Second, while the Tenant asserted that the Landowner violated the Soil Bank Act in securing the execution of this Contract, neither the County nor the State Committee determined that the Landowner had violated the *Contract*. On the contrary each held that there was no violation.

The result is that conceding the correctness of the Tenant's assertion that the Landlord's action was unlawful, there was no administrative determination that the "producer"—whether tenant or landowner or both—had violated the contract.

## II.

For the reasons spelled out in Dickson v. Edwards, supra, that was the sole matter accorded judicial review. Cf. United States v. Maxwell, 8 Cir., 1960, 278 F.2d 206.

 Section 1831 (7 U.S.C.A. § 1831) has both an affirmative and negative significance. Affirmatively, in a judicial system resting upon a statutory source for jurisdiction in the district courts, see Sheldon v. Sill, 1850, 8 How. 441, 12 L.Ed. 1147, this section opens the courthouse door as to a limited controversy and as to specified parties—the administrators of the Act. The affirmative grant of jurisdiction is lacking here. Negatively, the precision with which the Act prescribes a limited judicial review —especially when read in conjunction with the over-all finality provision of the statute[4]—eliminates the Administrative Procedure Act as the statutory source of judicial review. The APA does not afford judicial review where the particular statute precludes it.[5]

2. 7 U.S.C.A. § 1821(a); 6 C.F.R. § 485.-301(p).

3. The Tenant's ¾th share would have been $1,237.10.

4. 7 U.S.C.A. § 1809. "The facts constituting the basis for any payment or compensation, or the amount thereof, authorized to be made under this chapter, when officially determined in conformity with applicable regulations prescribed by the Secretary, shall be final and conclusive and shall not be reviewable by any other officer or agency of the government. * * *."

5. Section 10 of the A.P.A., 5 U.S.C.A. § 1009, provides that "Except so far as (1) statutes preclude judicial review * * *" any "person * * * adversely affected * * * shall be entitled to judicial review * * *" of "any agency action * * *." Heikkila v. Barber, 1953, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972, rehearing denied, 345 U.S. 946, 73 S.Ct. 828, 97 L.Ed. 1371; Barnett v. Pennsylvania-Reading Seashore Line, 3 Cir., 1957, 245 F.2d 579; Updegraff v. Talbott, 4 Cir., 1955, 221 F.2d 342; Kirkland v. Atlantic Coast Line Ry. Co., 1948, 83 U.S.App.D.C. 205, 167 F.2d 529, certiorari denied, 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393; cf. Airline Dispatchers Ass'n v. National Mediation Board, 1951, 89 U.S.App.D.C. 24, 189 F.2d 685, certio-

Granting but a limited review, the inference is compelling that Congress deliberately intended to keep the practical operation of this farm program out of the courthouse. Whatever might be thought to be the shortcomings of the informal tribunals of County and State Committees made up as they would be by persons having evident self-interests, Congress purposely undertook to lodge immediate responsibility in these neighborhood tribunals. Nearness to the problem and to the people affected—or afflicted—by adjudications having decisive consequences may well have been to Congress the assurance of responsible impartiality. See Fulford v. Foreman, 5 Cir., 1957, 245 F.2d 145, 147.

Indeed, the legislative history supports the view that in effectuating the vigorous policy against the use of any devious schemes by landowners as a means of discriminating against tenants [6] Congress looked to the County Committees as the means of positive enforcement.[7]

rari denied 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641.

6. Section 122 of the Soil Bank Act, 7 U.S. C.A. § 1810:

"In the formulation and administration of programs under this chapter, the Secretary shall provide adequate safeguards to protect the interests of tenants and sharecroppers, including provisions for sharing, on a fair and equitable basis, in payments or compensation under this chapter, and including such provision as may be necessary to prevent them from being forced off the farm. * * *"

The regulations covering the Acreage Reserve Program are more precise.

485.319 *"Addition provisions relating to tenants and sharecroppers.* (a) No agreement with respect to any commodity shall be entered into with a producer if the county committee determines:

"(1) That the landlord or operator has not afforded his tenants and sharecroppers an opportunity to participate under the agreement * * *; or

"(2) that the landlord or operator has, in anticipation or because of participating in the Soil Bank Program, reduced the number of tenants and sharecroppers on the farm, or the shares of the allotment made available to tenants or sharecroppers * * *;

"(3) that there exist between the operator or landlord and any tenant or sharecropper any * * * agreement, or understanding, unfairly exacted * * * by the * * * landlord and entered into in contemplation of the signing of any agreement hereunder, the effect or purpose of which is:

"(i) to cause the tenant or sharecropper to pay over to the landlord * * * any compensation to be paid to him under the agreement; or

"(ii) to change the status of any tenant or sharecropper in order to deprive him of any part of the compensation to which his actual status with respect to the land prior thereto would have entitled him; or

"(iii) to reduce the size of the tenants' or sharecropper's share of the allotment in contemplation of the signing of the agreement; or * * *

"(4) that the operator or landlord has adopted any device or scheme of any sort whatever for the purpose of depriving any tenant or any sharecropper of his compensation or any other right under the agreement.

"(b) The agreement shall be deemed to have been violated if any of the conditions set forth in paragraph (a) of this section are discovered after the signing of the agreement, or if, after the signing of the agreement, the operator or landlord enters into any lease, contract, agreement or understanding with any tenant or sharecropper of the nature prohibited by paragraph (a) (3) of this section or adopts any scheme or device prohibited by paragraph (a) (4) of this section."

See also § 485.290 which provides that if the number of tenants has been reduced in anticipation of an ARC Contract, the amount payable to the landowner shall be forfeited and the State Committee may determine that the aggrieved tenant is entitled to a portion of the forfeited payment. See also 485.168.

7. See the Conference Report on H.R. 12, 84th Cong. This bill, after being passed by Congress, was vetoed by the President. However H.R. 10875 which became the Agricultural Act of 1956, contains the identical provision with respect to the rights of tenants and sharecroppers as appeared in H.R. 12. The Conference Report on H.R. 12 stated:

*"Protection of tenants and sharecroppers.* No single problem connected with the proposed soil bank had caused the committee more concern than that of guaranteeing adequate protection of ten-

Congress presumably put its faith in the localized and immediate responsibility of these groups as their decisions had to pass muster in the particular community. It purposely chose this in preference to its unsuccessful effort to legislate more precise standards to protect tenants who, from ignorance or poverty or lack of resources, were looked upon as a more helpless class.[8]

■■ This is, of course, but another instance in which Congress creating the grant of public funds may determine the basis upon which money is to be paid or distributed. This includes as well the machinery for the determination of the facts upon which statutory standards are to operate. As Congress did not permit judicial review of any decisions other than that of a violation of a contract by a producer, neither the District Court nor this Court has the power to say whether the action of the County and State Committees was correct.

### III.

But this affirmance on Dickson v. Edwards relates solely to the Tenant's action against the governmental defendants. For two reasons that case does not control the disposition of Caulfield's suit against the private defendant Coats or his Succession.

■ First, the only appearance below and here for defendants was through the United States Attorney on behalf of the governmental parties. No appearance has yet been made on behalf of the private defendant Coats or his Succession.[9] Obviously, the summary judgment entered for the "defendants" related solely to the governmental agents and agency. It did not undertake to pass upon the rights of Caulfield vis-a-vis the private defendant Coats.

■■ Second, the situation is quite different from the private suit in Dickson. There the Soil Bank Act came into the case only as an anticipated defense and the tenant's claim did not therefore "arise under" the Soil Bank Act. Here, without intimating how the matter should or will ultimately be decided, it appears from the complaint as expanded that the plaintiff Caulfield is directly in-

---

ants and sharecroppers under the program. Several provisions referring to tenants and sharecroppers and intended to protect their interest, while at the same time safeguarding the interests of landlords, were scattered throughout the soil-bank portion of the Senate bill. After the most careful consideration, the committee considered them inadequate to afford the protection desired. The committee tried for many hours to devise a specific legal formula or direction to the Secretary of Agriculture covering the landlord-tenant-sharecropper relationship which would assure by specific legal provision fair treatment of all concerned. It realizes, however, that these relationships are so different in various types of farming areas and in different geographic locations, and even from one farm to the next in the same area, that it is probably impossible to write into the law a formula for equitable sharing in benefits under the soil bank act which will work fairly in all the multitude of individual relationships of this type which exist.

"After the most thorough consideration, therefore, the committee of conference reached the conclusion that the safest way to guarantee fair treatment of all

participants in the soil bank program is to put into the law the general rules on which the division of benefits under this act is to be made, to require that each landlord in applying for participation in the program stipulate in detail how he proposes to share the benefits with his tenants or sharecroppers, and to require the county committee made up of farmers who are thoroughly familiar with local conditions to approve the proposed division of benefits before the farmer will be permitted to participate in the program. The stipulated and approved proposal for dividing the benefits will then be made a part of the contract and failure or refusal to carry out that provision would subject the producer to the penalties provided by the act.

8. The brief by appellant's counsel describes him as "a poor, ignorant [sharecropper who] did not know he was entitled to any portion of the payment until informed of it by a soil bank worker and another plantation owner."

9. As a matter of fact the record is unclear as to whether process has yet been served.

voking a federal statutory right. The theory of Caulfield's claim is that contrary to the Soil Bank Act (see footnote 6, supra), the Landowner defendant ousted him in anticipation of making an ARC Contract. Thus the asserted prohibition of the Soil Bank Act seems to be the very basis for the recovery sought. The right, if it exists, comes into being from the Federal Act and the effectual enforcement of that right depends on the validity, construction or effect of that statute. If that is ultimately borne out by a proper study of the complaint this would, of course, make it a suit arising under a law of the United States, and here one regulating commerce.[10] Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L. Ed. 939; Gully v. First National Bank, 1936, 299 U.S. 109, 57 S.Ct. 96, 81 L. Ed. 70. Of course, that phase is not directly before us and these tentative comments are stated merely to make certain that affirmance on the basis of Dickson v. Edwards is confined to the governmental suit, not the one against the private defendant. The ultimate decision in the private suit against Coats or his Succession must await its trial or other appropriate proceedings.

Affirmed.

WISDOM, Circuit Judge, joined by TUTTLE, Chief Judge, and RIVES, Circuit Judge (dissenting).

I respectfully dissent. I cannot believe that Congress intended the Soil Bank Act to be given the discriminatory effect denial of judicial review gives it in this case.

The controversy is between landlord and tenant. The majority opinion recognizes that the landlord would have the right to judicial review of administrative action depriving him of payments under his soil bank contract. But the Court bars judicial review to a tenant or sharecropper deprived of soil bank payments and as adversely affected by the ASC committee determination of *no* violation as the landlord would be affected by the determination there was a violation. This unfortunate limitation of review follows from an over-literal construction of the Act and the regulatory scheme for administration of the Soil Bank Program as denying judicial review except when the Secretary terminates a soil bank contract because of a violation of the contract.[11] The effect of the holding is to ignore the practicalities and to work a serious injustice on tenants in Caulfield's sorry fix. When the Committee holds that the landlord has not violated the contract, there is no reason for him to go to the courts for relief: he is not hurt. But there may be very good reason, as in this case, for the tenant to appeal to the courts: he is deprived of his livelihood without compensation. The

10. As the Tenant's claim for his portion amounts to $1,237.10, see note 3, supra, the requisite amount in controversy would not exist under 28 U.S.C.A. § 1331. But since statutes effectuating the Federal Farm Program constitutionally rest on the Commerce Clause, Article 1, § 8, Clause 3 of the Constitution, jurisdiction would likely exist under 28 U.S.C.A. § 1337 as to which there is no requisite amount in controversy. United States v. Haley, 1959, 358 U.S. 644, 79 S.Ct. 537, 3 L.Ed.2d 567; Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122.

11. The majority opinion states: "The result is that conceding the correctness of the Tenant's assertion that the Landlord's action was unlawful, there was no administrative determination that the 'producer'—whether tenant or landowner or

both—had violated the contract. For the reasons spelled out in Dickson v. Edwards, supra, that was the sole matter accorded judicial review." In Dickson v. Edwards the Court held: "[J]udicial review is provided only where the Secretary terminates a contract because of a *violation* of the contract. Consequently, the [District] Court concluded, since Dickson [the tenant] did not *violate* the contract and his rights terminated simply because he was no longer the lessee the statutory basis for review was lacking. * * * The one decision open to judicial review is termination of the contract by the Secretary of Agriculture after a determination by him that a violation has occurred of such a substantial nature as to warrant termination rather than a mere partial forfeiture of benefits." See footnote 15.

incongruity of the result is underscored by the fact that in most cases the tenant has a larger interest in the farming revenues than the landlord; here, for example, Caulfield is entitled to three-fourths of the farming revenues, and claims three-fourths of the soil bank payments, as against Coats's one-fourth. The incongruity is more anomalous when one considers that in the natural course of events appointments to ASC committees, which double as courts besides exercising an enormous influence in the administration of agricultural affairs, fall to large landowners and farm operators—not to tenants and sharecroppers.

I start with a presumption: "[I]n our system of remedies, an individual whose interest is acutely and immediately affected by an administrative action presumptively has a right to secure at some point a judicial determination of its validity. This is to me the teaching of our

history and tradition. It is our common law, and in a lesser measure a corollary of our constitutions. I am well aware that this assertion can be criticized as a futile, an empty, a useless generality. I think on the contrary that it is an important proposition, and that if it is entertained by a court it may become a crucial factor in the decision to review." Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 401, 420 (1958).

In the Soil Bank Act Congress hammered out national policy after full consideration of the importance of protecting conflicting economic interests. The Act shows clearly that Congress intended tenants and sharecroppers to have a fair share in the Soil Bank Program.[12] The legislative history of the Act shows congressional concern for fear landlords might do exactly what Caulfield charges his landlord did in this case.[13] The soil

12. The Conference Report on H.R. 12, 89th Cong., 2d Sess., states:

*"Protection of tenants and sharecroppers.* No single problem connected with the proposed soil bank had caused the committee more concern than that of guaranteeing adequate protection of tenants and sharecroppers under the program." See footnote 7. Section 122, 7 U.S.C.A. § 1810, provides:

"In the formulation and administration of programs under this chapter, the Secretary shall provide adequate safeguards to protect the interests of tenants and sharecroppers, including provisions for sharing, on a fair and equitable basis, in payments or compensation under this chapter, and including such provision as may be necessary to prevent them from being forced off the farm. Applications to participate in any such program shall specify the basis on which the landlord, tenants, and sharecroppers are to share in such payments or compensation, and no contract under any such program shall be entered into unless such basis is approved by the county committee and incorporated into the contract. The standards prescribed by the Secretary for the guidance of county committees in determining whether any such basis shall be approved shall include the requirement that consideration be given to the respective contributions which would have been made by the landlord, tenants, and share-

croppers in the production of the crops which would have been produced on the acreage diverted from production under the contract and the basis on which they would have shared in such crops or the proceeds thereof."

13. See footnote 7. In the hearings on the soil bank, the following colloquy took place between the members of the Subcommittee on Agriculture of the Committee on Appropriations and the Assistant Secretary of Agriculture:

"Mr. Marshall. (Congressman from Minnesota) Now, Mr. Secretary, I keep getting complaints about the fact that people, landowners, put their entire farm into the acreage reserve.

"Mr. McLain (Assistant Secretary of Agriculture) Don't you get complaints on Conservation reserve, too?

"We get that.

"Mr. Marshall. I haven't on conservation reserve. But I have on acreage reserve—that they put their whole farm into the program—

"Mr. McLain. Of course, that is—

"Mr. Marshall. And they have told their tenants to move on.

"Do you have any regulation to prevent that sort of thing from happening?

"Mr. McLain. Of course, they can't put their whole farm in the acreage reserve, you understand. The only acreage they are eligible to put in are the reductions they make from their allotments,

bank regulations of the Department of Agriculture show a conscious endeavor to carry out the congressional mandate of protecting the interests of tenants and sharecroppers, even though the implementation falls short of the Department's good intentions.[14] Accordingly, in construing the Act and the regulations

and they are only fractions of the total farm acreage.

"I am sure that is what you meant.

"We have had units where they have combined the conservation reserve and the acreage reserve to try to take out as much land as they can, which we think is probably a good thing on some of these farms.

"Now, if you are getting to the question of what we are doing where the individual kicked the tenant off or made different arrangements because of this in order to get payment, of course, we have some regulations that tie that down, we think, fairly well.

"Mr. Doggett (Director, Soil Bank Division, Commodity Stabilization Service) could explain them to you.

"Mr. Marshall. I wonder, because of the interest in that phase of it, if those regulations could be placed in the record.

"Mr. McLain. We would be happy to do that.

"Mr. Doggett. We would be glad to.

"Mr. McLain. Yes.

"Mr. Doggett. Would you like the entire acreage and conservation reserve regulations placed in the record.

"Mr. Marshall. The question that prompted this was the question that came to me concerning the acreage reserve, not the conservation reserve, but the reports that have been coming to me are that landlords have put their farms under the soil bank and told their tenants to move.

"Mr. McLain. Haven't you had reports, too, where the doctor, the barber has bought the farm and done that?

"Mr. Marshall. I haven't had that.

"Mr. McLain. We have had those.

"Mr. Anderson. (Congressman from Minnesota) I have had some such reports.

"Mr. McLain. I think they are small in number. It is on the other side, though, the fact some people are trying to tell us we are making these rates too attractive, both conservation reserve and acreage reserve, which, of course, we don't think we have done; but there are people who think we have done it.

"Mr. Marshall. That is all."

Mr. McLain then put in the record the Department's Soil Bank Violations Procedure regulations. Section 385:222 of the 1957 Acreage Reserve Program and Section 485:168 of the Conservation Reserve Program. Hearings before the Subcommittee on Agriculture of the House Committee on Appropriations on H.R. 10,875, 84th Cong., 2nd Sess., at 1679–1681 (1957).

In H.R. No. 2077, 84th Cong., 2nd Sess., the House Committee on Agriculture commented as follows:

"Section 122.—Requires that in carrying out the soil bank program, the Secretary shall provide 'adequate safeguards to protect the interests of tenants and sharecroppers.' Rather than trying to establish a formula under which tenants and sharecroppers are to participate in the benefits of the soil bank program, the section places the basic responsibility for assuring tenants and sharecroppers equitable treatment on the shoulders of those most competent to make decisions of this nature—the county ASC committees. The section requires that applications to participate in the soil bank program must specify the basis on which tenants and sharecroppers are to share in the payments. This proposed arrangement must be approved by the county committee and written into the contract."

14. This case involves the acreage reserve program and the regulations governing the 1958 program. 22 Fed.Reg. 6397; 6 CRF 485:301–38. See Section 485:-319 set forth in footnote 6. See also footnote 15. Section 485:319 is identical with Section 385:222 of the 1957 Acreage Reserve Program and is very similar to Section 485:168 of the 1957 Conservation Reserve Program. Under the 1957 acreage reserve program the following provisions are pertinent:

"§ 485:290. *Provisions relating to unfair treatment of tenants and sharecroppers.*

"(b) Where the number of tenants and sharecroppers on the farm, or the shares of the farm allotment made available to tenants or sharecroppers, have been reduced in anticipation or because of participating in the Soil Bank Program, the entire amount payable or paid to the operator shall be forfeited or refunded.

* * *

"(e) In any case where an operator or landlord or owner is required to forfeit or refund any compensation under the foregoing provisions of this section, and the State Committee determines that such tenant or sharecropper is entitled to any part of such compensation, the amount of compensation due

as permitting or denying a tenant the right of review, I find it easier to reach a result carrying out the congressional policy of giving tenants a fair shake than to reach a result frustrating that policy.

The Court infers, here and in Dickson v. Edwards, that since the Act expressly provides a procedure for review [15] when there is an agency decision to terminate a contract, Congress intended to deny review of any other type of agency decision under the Soil Bank Act.[16] I question that Congress had any such intentions. I infer simply that Congress felt

such tenant or sharecropper shall be paid to him out of the funds forfeited or refunded by the operator, owner or landlord."

15. Section 103(a) (i) of the Act, 7 U.S.C.A. § 1821(a) (i), provides:
"In the event that the Secretary determines that there has been a violation of the contract at any stage during the time such producer has control of the farm and that such violation is of such a substantial nature as to warrant termination of the contract, to forfeit all rights to payments or grants under the contract, and to refund to the United States all payments and grants received by him thereunder: *Provided, however*, That the provisions of section 1831(d) of this title shall apply to the termination of any contract hereunder."

Section 107(d), 7 U.S.C.A. § 1831(d) provides:
"A contract shall not be terminated under paragraph (6) of subsection (a) of this section unless the nature of the violation is such as to defeat or substantially impair the purposes of the contract. Whenever the State committee believes that there has been a violation which would warrant termination of a contract, the producer shall be given written notice thereof by registered mail * * * or personal service, and the producer shall, if he requests such an opportunity within thirty days after the delivery or service of such notice, be given an opportunity to show cause, in an informal proceeding before the county committee under regulations promulgated by the Secretary, why the contract should not be terminated. If the producer does not request an opportunity to show cause why the contract should not be terminated within such thirty-day period, the determination of the State committee made in accordance with regulations of the Secretary shall be final and conclusive. If the producer within such thirty-day period requests an opportunity to show cause why the contract should not be terminated, the county committee, at the conclusion of the proceeding, shall submit a report, including its recommendations, to the State committee, for a determination, on the basis of such report and such other information as is available to the State committee, as to whether there has been a violation which would warrant termination of the contract. The producer shall be accorded the right, in accordance with regulations promulgated by the Secretary, to appear before the State committee in connection with the State committee's determination of the issue. The producer shall be given written notice by registered mail * * * or personal service of the State committee's determination. If the producer feels aggrieved by such determination, he may obtain judicial review of such determination by filing a complaint with the United States District Court for the district in which the land covered by the contract is located, within ninety days after the delivery or service of notice of such determination, requesting the court to set aside such determination. * * * The action in the United States District Court shall be a trial de novo to determine whether there has been a violation which would warrant termination of the contract. If the producer does not seek judicial review of the State committee's determination within the ninety-day period allowed therefor, the State committee's determination shall be final and conclusive. * * * "

16. See Switchmen's Union of North America v. National Mediation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61. Professor Jaffe comments: "But Switchmen's Union has borne little fruit," Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 401, 420 (1958). He contrasts the approach in Switchmen's Union with the approach in Stark v. Wickard, 1944, 321 U.S. 288, 64 S.Ct. 559, 88 L. Ed. 733, and in Dismuke v. United States, 1936, 297 U.S. 167, 56 S.Ct. 400, 403, 80 L.Ed. 561. In Dismuke the Supreme Court said: "[I]n the absence of compelling language, resort to the courts to assert a right which the statute creates will be deemed to be curtailed only so far as authority to decide is given to the administrative officer * * * [An authority given to the officer] to adjudicate the claim * * * does not authorize denial of a claim if the undisputed facts establish its validity as a matter of law, or preclude the courts from ascertaining

that when a soil bank contract is terminated the procedural safeguards should be carefully outlined and the producer should have the benefit of the now relatively uncommon right of review by trial de novo in the district court rather than limited review as to the substantiality of the evidence. But surely all other soil bank administrative action affecting producers is not immune from judicial scrutiny. The right of judicial review is too fundamental a safeguard in our system of law to be waived aside on such thin evidence of congressional intent.

The Court relies heavily on the "finality" provision of the Act, 7 U.S.C.A. § 1809:

> "The facts constituting the basis for any payment or compensation, or the amount thereof, authorized to be made under this chapter, when officially determined in conformity with applicable regulations prescribed by the Secretary, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government. * * * "

If we must adopt so narrow a construction that review may be had of a determination of a violation but not of a determination of no-violation, consistency in strict construction should require us to hold that the finality provision applies when there is payment but not when, as in this case, there is no payment (to the tenant). More importantly, I read Section 1809 as limited to *fact*-finding. Finality of *fact*-finding leaves the door wide open to court review for the purpose of determining if the agency correctly applied the law to the facts and acted within its authority.[17] cf. Aycock-Lindsey Corp. v. United States, 5 Cir., 1948, 171 F.2d 518; 5 Cir., 187 F.2d 117.[18]

Assuming that in the proper case the finality provision might apply to a review of the facts, the provision seems inapplicable to the facts of the instant case, as the regulatory scheme is now constructed. The Act (7 U.S.C.A. § 1809) makes the finality of the agency decision contingent on the determination having been in conformity with "applicable regulations prescribed by the Secretary". But—the Act is silent and the Secretary has prescribed no applicable regulation for the administrative problem this case presents: the procedure for administrative action and review when (1) there is a dispute between landlord and tenant as to the latter's right to participate in soil bank benefits and (2) there is an ASC committee determination that the landlord has not violated his soil bank contract. The tenant is not accused of a contract violation. And, he has no soil bank contract to be terminated.

Thus, even as to facts constituting the basis for the agency decision, there is no express preclusion of judicial review. Certainly, review should not be precluded by implication, contrary to the purposes of the Act. Since the Act does not preclude judicial review and since the action is not committed to "agency discretion", the determination of the ASC committees, approved by the Secretary of

whether the conceded facts do so establish it." Cf. United States v. I. C. C., 1948, 337 U.S. 426, 433, 69 S.Ct. 1410, 93 L.Ed. 1451.

17. Davis points out that Section 10 of the Administrative Procedure Act "is carefully framed to avoid the all-or-none fallacy"; "The opening words are not 'except when' but 'except so far as'." 4 Davis, Administrative Law Treatise § 28.10, (1958).

18. In Aycock-Lindsey Corp. v. United States, 1948, 5 Cir., 171 F.2d 518, 522, the Court stated: "We do not interpret the Act as preventing, or undertaking to prevent, a review by the courts of the legal questions involved, but only to preclude a review of the facts constituting the basis for payment, and, therefore the Court below was not precluded from adjudicating the legal question as to whether or not the two corporations should be treated as one, as well as such other questions as may be developed upon the coming in of defendant's answer. See Dismuke v. U. S., 297 U.S. 167, 56 S. Ct. 400, 80 L.Ed. 561; United States v. Laughlin, 249 U.S. 440, 441, 39 S.Ct. 340, 63 L.Ed. 696."

Agriculture, is subject to review under Section 10(a) of the Administrative Procedure Act, 5 U.S.C.A. § 1009.[19] This section provides:

"Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion. (a) Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."

As Congressman Walters said of Section 10: "Legislative intent to forbid judicial review must be, if not [in] specific * * * terms, at least clear and unmistakable. * * * The mere fact that Congress has not expressly provided for judicial review would be completely immaterial." Sen.Doc. 248, 79th Cong., 2nd Sess., 368 (1946). The silence of Congress "as to judicial review is not necessarily to be construed as a denial of the power of the federal courts to grant relief in the exercise of the general jurisdiction which Congress has conferred upon them. * * * Judicial review may indeed be required by the Constitution. Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938. Apart from [the] constitutional requirements, the question whether judicial review will be provided where Congress is silent depends on the whole setting of the particular statute and the scheme of regulation which is adopted." Estep v. United States, 1946, 327 U.S. 114, 66 S.Ct. 423, 426, 90 L.Ed. 567.

"Finality" is an illusion in most statutes.[20] It is a mirage if relied on to pre-

---

19. "[E]xemptions from the * * * Administrative Procedure Act are not lightly to be presumed * * * and unless made by clear language of supersedure the expanded mode of review granted by the Act cannot be modified." Brownell v. We Shung. 1956, 352 U.S. 180, 185, 77 S.Ct. 252, 256, 1 L.Ed.2d 225.

20. "Perhaps the most striking feature of the law of reviewability is the unreliability of the literal words of statutes, no matter how clear and unequivocal." 4 Davis, Administrative Law Treatise § 2801 (1958). Similarly, in England, in the face of direct prohibitions of judicial review, English courts have "clung tenaciously to their powers of review." DeSmith, Judicial Review of Administrative Action, p. 222–49, at p. 247 (1957).
It is easy to belabor reviewability. Rather than belabor it by piling case on case, I cite the following cases as a sampling of decisions allowing review in the teeth of statutes precluding review. The Universal Military Training and Service Act provides that decisions of the local board are "final," 50 U.S.C.A. Appendix, § 460(b) (3). Judicial interpretation of "final" has made it less than "final." When a local board acts in disregard of the law or without evidence to support its finding, it acts outside of its jurisdiction. Estep v. United States, 1945, 327 U.S. 114, 66 S.Ct. 423, 90 L. Ed. 567; Dickinson v. United States, 1953, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132. In deportation cases the finality clause does not bar review of fair procedure, statutory interpretation, and evidence to support the finding. Kessler v. Strecker, 1939, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082; Heikkila v. Barber, 1953, 345 U.S. 229, 73 S.Ct. 603, 607, 97 L.Ed. 972. In United States ex rel. Hintopoulos v. Shaughnessy, 1957, 353 U.S. 72, 77 S.Ct. 618, 621, 1 L.Ed.2d 652, the Court allowed judicial review of the question whether the Board of Immigration Appeals "applied * * * correct legal standards." In spite of the language of the Second Renegotiation Act, 50 U.S. C.A. Appendix, § 1191(e) that a determination "shall not be reviewed or redetermined by any court or agency," Blanchard Mach. Co. v. R. F. C. Price Adjustment Board, 1949, 85 U.S.App.D.C. 361, 177 F.2d 727, certiorari denied 339 U.S. 912, 70 S.Ct. 571, 94 L.Ed. 1338, allowed review of jurisdictional questions. United States v. California Eastern Line, 1955, 348 U.S. 351, 75 S.Ct. 419, 99 L.Ed. 383 the Court held that question whether a contract was renegotiable was reviewable. In Hospoder v. United States, 3 Cir., 1953, 209 F.2d 427, 429, the Court was faced with a mandamus proceeding brought to require the Veterans' Administration to give the plaintiff a rehearing on his disability claim, in spite of statutory language providing that decisions of the Administrator of Veterans' Affairs "shall be final and conclusive on all questions of law and fact, and no other official or court of the United States shall have jurisdiction to review by man-

clude *any* judicial review of an administrative agency's decisions.[21] No legislative language can deprive a man of a fair hearing in the adjudication of his rights; or, of his right to have a court decide whether the administrative agency acted within its jurisdiction; and, whether the agency through a lay tribunal applied the correct rule of law to the facts.[22]

The law of administrative justice is still in a state of flux. The only common denominator of the decided cases I am able to discern is the broad principle, loosely applied, that finality language will be whittled down to size—to fit the Court's sense of fundamental fairness, whenever that sense is offended by denial of judicial review. I do not say that the courts decide reviewability cases guided only by their own notions of abstract justice. If courts rationalize fair play in terms of "jurisdiction", "statutory construction", "due process", or some other legal concept it is always, I hope, in proper context, considering the circumstances of the case and the interplay of policy, statute, and regulation; reducing the subjective element by weighing the presence or absence of constitutional safeguards, the reasonableness of the regulatory scheme, the effectiveness of administrative relief, the adequacy of administrative check on initial action, the comparative qualifications of courts on the one hand or administrative tribunals on the other hand to decide the par-

damus or otherwise any such decision." 38 U.S.C.A. § 11a–2. Not one but two sections declared that the Administrator's decisions were final and review was prohibited. Id. § 705 [Now 38 U.S.C.A. § 211]. Nevertheless, the court held that "in a proper case under Section 11a–2 mandamus will lie even though the district court may not review the Administrator's factual or legal determinations." See also Siegel v. United States, D.C. E.D.N.Y.1949, 87 F.Supp. 555, 558, stating that when "the equity powers of the court are properly invoked by a clear showing that the administrative officer acted in excess of the jurisdiction conferred, appropriate relief may be obtained."

21. "It is more in harmony with the generous review provisions of the Administrative Procedure Act to construe the ambiguous word 'final' in the 1952 Immigration Act as referring to finality in administrative procedure rather than as cutting off the right of judicial review in whole or in part." Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 51, 75 S.Ct. 591, 594, 99 L.Ed. 868. See also Brownell v. We Shung, 1956, 352 U.S. 180, 185, 77 S.Ct. 252, 256, 1 L.Ed.2d 225: "[T]he finality provision of the 1952 Act in regard to exclusion refers only to administrative finality."

22. "The supremacy of law demands that there shall be [an] opportunity to have some court decide whether an erroneous rule of law was applied and whether the proceeding in which facts were adjudicated was conducted regularly. To that extent, the person asserting a right,

whatever its source, should be entitled to the independent judgment of a court on the ultimate question of constitutionality." Mr. Justice Brandeis in a dissenting opinion in St. Joseph Stock Yards Co. v. United States, 1936, 298 U.S. 38, 56 S.Ct. 720, 740, 80 L.Ed. 1033. Davis and Hart are critical of this view. Davis, 4 Administrative Law Treatise § 28.18, p. 98; Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362 (1953). Jaffe comments, however: "[T]he availability of judicial review is, in our system and under our tradition, the necessary premise of legal validity. It is no doubt logically possible for the immediate possessor of power to keep within imposed limits. For the most part he does so, and may indeed be very eager to do so; and furthermore, in the vast hierarchy of a modern administration, there is always the possibility of appeal to and rectification by a higher level within the hierarchy. Yet there is in our society a profound, tradition-taught reliance on the courts as the ultimate guardian and assurance of the limits set upon executive power by the constitutions and legislatures. * * * The guarantee of legality by an organ independent of the executive is one of the profoundest, most persuasive premises of our system. Indeed I would venture to say that it is the very condition which makes possible, which makes so acceptable, the wide freedom of our administrative system, and gives it its remarkable vitality and flexibility." Jaffe, The Right to Judicial Review, Harv.L.Rev. 401, 403 (1958).

ticular question at issue, the nature of the judicial review prayed for, the nature of the administrative action, and many other factors, some at cross-purposes.

The Attorney General finds a consistent principle running through the Supreme Court's holdings on reviewability. He finds that unreviewability is the order of the day when administrators deny the benefits to the beneficiaries of government programs, while reviewability follows when administrators enforce the obligations of government programs against those who are subject to the disadvantages of the programs. This so-called principle is of doubtful validity at best,[23] but assuming its soundness when it is applied to a controversy between the beneficiary and the administrator—it should have no application when the controversy is really between two private persons over their share in the government program.

Congress created a right in tenants and sharecroppers to have a fair part in the Soil Bank Program. Congress set up standards to protect that right. This case raises a serious question whether the Department of Agriculture departed from the standards set by Congress, in its regulations or in the administrative actions of its law courts, the ASC committees. This is enough to justify review, apart from any express or implied provisions of the Soil Bank Act allowing review, and even apart from Section 10 of the Administrative Procedure Act.

Congress has developed a startling and extraordinary insensitivity to politics, to economics, and to justice, and produced a strange out of character sort of law—if the Soil Bank Act locks the courthouse doors to tenants and share-croppers seeking review of administrative action but unlocks and opens wide the courthouse doors to their landlords.

I would reverse the district court, and grant review.

---

**23.** "It is sometimes suggested that when the United States creates rights against itself, particularly rights to the payment of money, the administrative remedy given to enforce the right presumptively excludes judicial review; the grant, it is said, is a mere 'privilege.' But there is little or no authority to support such a presumption. The authorities indeed are to the contrary and on principle no such presumption should be entertained. The notion of 'privilege' is in this context a perversion of thought and of language." Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 769, 784 (1958).