**OCCIDENTAL CHEMICAL CORPORATION and the Pillsbury Company, Plaintiffs,**

v.

**The POWER AUTHORITY OF the STATE OF NEW YORK, Defendants.**

**GENERAL MILLS, INC., and Bethlehem Steel Corporation, Plaintiffs,**

v.

**The POWER AUTHORITY OF the STATE OF NEW YORK, Defendant.**

Nos. CIV–90–208C, CIV–90–391C.

United States District Court, W.D. New York.

March 15, 1991.

As Amended April 11, 1991.

Sutherland, Asbill & Brennan (Earle H. O'Donnell, of counsel), Washington, D.C., for plaintiff Occidental Chemical Corp.

Brown & Kelly (Kevin A. Ricotta, of counsel), Buffalo, N.Y., for plaintiff Pillsbury Co.

Couch, White, Brenner, Howard & Feigenbaum (Algird F. White, Jr., of counsel), Albany, N.Y., for plaintiffs General Mills,

Inc., Bethlehem Steel Corp., Nabisco Brands, Inc. and Union Carbide Corp.

Mitchell F. Borger, New York City, for defendant Power Authority of the State of N.Y.

## BACKGROUND

CURTIN, District Judge.

The central issue in both of these cases is whether the Power Authority of the State of New York ("PASNY") is authorized under the Niagara Redevelopment Act ("NRA"), 16 U.S.C. §§ 836, 836a, and/or its license issued thereunder by the Federal Power Commission ("FPC"), 19 F.P.C. 186 (Jan. 30, 1958),[1] to independently raise utility rates for Replacement Power as defined in the NRA. 16 U.S.C. § 836(b)(3). Plaintiffs in both cases allege that PASNY was without authority to raise rates and therefore violated section (b)(3) of the NRA, 16 U.S.C. § 836(b)(3),[2] and Article 22 of its federal license, 19 F.P.C. 186, and the Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.* GM Item 7, ¶¶ 56–57; OCC Item 1, ¶¶ 43–44. In addition, plaintiffs in the *General Mills* case append three causes of action alleging that PASNY violated state law. GM Item 7, ¶¶ 58–82.

Plaintiffs seek a declaratory judgment that PASNY's increased Replacement Power rate is illegal, a declaration prohibiting PASNY from setting rates above the cost of producing Replacement Power from PASNY's Niagara Power Project, an injunction holding PASNY to these rulings, and damages for any revenue collected in excess of such costs. Defendants move to dismiss plaintiffs' complaints under Fed.R. Civ.P. 12(b) on the grounds that (1) plaintiffs fail to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), (2) the court should abstain from entertaining jurisdiction of this matter in the interest of

---

**1.** The Federal Power Commission is now the Federal Energy Regulatory Commission ("FERC"). *See* 42 U.S.C. §§ 7151(b), 7171(a), 7172(a), 7291, 7293.

**2.** Item 7, ¶¶ 54–55, *Occidental Chem. Corp. v. Power Auth. of the State of New York*, CIV-90-

208 [hereinafter OCC Item __]; Item 1, ¶¶ 41–42, *General Mills, Inc. v. Power Auth. of the State of New York,* CIV-90-391 [hereinafter GM Item __].

comity, and (3) in *General Mills*,[3] once the federal claims are dismissed, the court should also decline pendant jurisdiction over the state law claims. Plaintiffs oppose the motion.

## FACTS

There appear to be no facts in dispute. To understand this controversy, however, a bit of history is in order. *See Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 100–06, 80 S.Ct. 543, 545–48, 4 L.Ed.2d 584 (1960) (detailing history surrounding passage of NRA). Under the Boundary Waters Treaty of 1909, 36 Stat. 2448, the United States and Canada agreed to permit each country to divert some of the flow of the Niagara river to produce electric power. In 1950, a new treaty was ratified ("1950 Treaty") which authorized the United States to divert a larger portion of water from the river. 1 U.S.T. 694. In ratifying the treaty, the United States Senate attached a provision requiring express Congressional authorization to develop the river.

Prior to June 7, 1956, the Niagara Mohawk Power Corporation ("Niagara Mohawk"), a public utility company, operated two hydroelectric power-generating stations on the Niagara River: the Adams Plant and the Schoellkopf Station. These plants, known as FPC Project 16 ("Project 16"), were operated pursuant to a license issued to Niagara Mohawk by the FPC. 1 F.P.C. 16. A number of industries, including the plaintiffs in these actions, located in the Niagara region to take advantage of the low cost power generated by Project 16. On June 7, 1956, however, a rockslide destroyed the Schoellkopf Station, dramatically reducing the power output of Project 16.

In response to the sudden loss of power-generating capacity in the Niagara region, Congress enacted the NRA, 16 U.S.C. §§ 836, 836a, in 1957 directing the FPC to issue a license to PASNY "for the construction and operation of a power project with capacity to utilize all of the United States share of the water of the Niagara River permitted to be used by international agreement." 16 U.S.C. § 836(a). Congress also directed that the FPC include in that license, in addition to those conditions deemed necessary by the FPC under the Federal Power Act, 16 U.S.C. § 791a *et seq.*, seven additional conditions governing the distribution and sale of the new project's power. 16 U.S.C. § 836(b)(1)–(7). These congressional conditions required that at least fifty percent of the project's power be available for the benefit of consumers, "to whom such power shall be made available at the lowest rates reasonably possible and in such manner as to encourage the widest possible use," § 836(b)(1), that a "reasonable" portion of the project's power, but not more than twenty percent, be sold to neighboring states, § 836(b)(2), and that

(3) The licensee [PASNY] shall contract, with the approval of the Governor of the State of New York, pursuant to the procedure established by New York law, to sell to the licensee of Federal Energy Regulatory Commission ("FERC") project 16 [Niagara Mohawk] for a period not ending later than the final maturity date of the bonds initially issued to finance the project works herein specifically authorized, four hundred and forty-five thousand kilowatts of the remaining project power, which is equivalent to the amount produced by project 16 prior to June 7, 1956, *for resale generally to the industries which purchased power produced by project 16 prior to such date, or their successors, in order as nearly as possible to restore low power costs to such industries* and for the same general purposes for which power from project 16 was utilized. . . .

§ 836(b)(3) (emphasis added). This last block of power was designed to "replace" power lost to local industries as a result of the slide, and thus came to be called "Replacement Power."

Pursuant to this statute, the FPC issued a license to PASNY on January 30, 1958. 19 F.P.C. 186. Article 22 of the FPC license incorporated verbatim section (b)(3)

---

**3.** In *Occidental Chem. Corp.*, plaintiffs only raise federal claims. OCC Item 1.

of the NRA, 16 U.S.C. § 836(b)(3). All other sections of the NRA were similarly incorporated into PASNY's license. 19 F.P.C. at 193–95. The FPC's order also stated that the license was issued subject to the terms and conditions of the Federal Power Act, the NRA, and the 1950 Treaty. *Id.* at 193. The license was made effective on September 1, 1957, forward for a period of fifty years. *Id.* PASNY completed construction and commenced operation of the Niagara project in 1961.

In February, 1961, PASNY, in accordance with the NRA, entered into a contract with Niagara Mohawk—Contract NS–1—to sell a total of 1,190,000 kilowatts ("kW") of power to Niagara Mohawk for resale to various customers in compliance with the NRA.[4] Of this power, 445,000 kW was designated as Replacement Power to be sold, "in accordance with [the NRA]," to industrial customers within thirty miles of PASNY's Niagara switchyard. GM Item 9, Exh. 1, Part Two, Art. VI [hereinafter Contract NS–1]. PASNY specifically reserved the right within Contract NS–1 to adjust rates charged to Niagara Mohawk for Replacement Power.

> The rate schedules specified in this contract shall be subject to successive modification by the Authority [PASNY] through the promulgation of superseding rate schedules.

Contract NS–1, *supra*, General Power Contract Provisions, Part E.

Also in February, 1961, when Replacement Power was first sold to Niagara Mohawk, PASNY set the price for such power at $1.00 per kilowatt month for demand and less than three-tenths of a cent (2.67 mills)[5] per kilowatt hour ("kWh") for energy, for an average cost to industry of less than one-half cent per kWh (4.38 mills). Contract NS–1, *supra*, Schedule NP–F1. This rate remained constant until 1990. GM Item 8, ¶ 19. Plaintiffs receive this

Replacement Power pursuant to resale contracts with Niagara Mohawk at a price equal to Niagara Mohawk's cost plus a transmission and delivery charge. *See* Contract NS–1, *supra*, Exh. B; GM Item 9, Exh. 2.

On September 26, 1989, PASNY filed notice of its first proposed increase in Replacement Power rates since 1961. GM Item 8, ¶ 31. The President of PASNY, in a memorandum placed before the Trustees on that date, opined that although the price for Replacement Power "should, at a minimum, recover the cost of service, [it] need not be limited to that level." *See* Item 9, Exh. 5, at 16. The President also commented that additional revenue from sale of Replacement Power, if not needed under the terms of the "General Purpose Bond Resolution," could be used "for any lawful corporate purpose," including "funding the Authority's capital program, such as timely completion of the Niagara Expansion Project, or the advance retirement of debt." *Id.*

After public comment and response, *see generally* Item 9, Exh. 5, Richard M. Flynn, Chairman of PASNY, submitted a report to the Trustees on December 21, 1989, *id.* at 1–12, in which he recommended PASNY approve proposed price increases for 1990 and 1991 and defer decision on proposed increases for 1992–1997. *Id.* at 1. The Trustees adopted the Chairman's recommendations.[6] The new Replacement Power rate was implemented on January 1, 1990. GM Item 8, ¶ 38.

## DISCUSSION

### I. "NO LAW TO APPLY"

Plaintiffs' two federal causes of action hinge on the same language, which Congress in the NRA directed to be incorporated by the FPC into its license with PASNY. That language, quoted in full above, pro-

---

**4.** The Project has a rated capability of 1,880,000 kW, *see* GM Item 8, ¶ 12, the majority of which is sold to Niagara Mohawk. All Replacement Power is sold through Niagara Mohawk, however, in compliance with the NRA. 16 U.S.C. § 836(b)(3).

**5.** One mill is equal to one-tenth of a cent.

**6.** The 1990 rate is $1.47 per kilowatt month for demand and 2.51 mills per kWh for energy. The 1991 rate will be $1.68 per kilowatt month for demand and 2.88 mills per kWh for energy. GM Item 8, ¶ 39.

vided that PASNY "shall contract" to sell 445,000 kW of power to Niagara Mohawk—the amount produced by Project 16 prior to June 7, 1956—

> for resale generally to the industries which purchased power produced by project 16 prior to such date, or their successors, *in order as nearly as possible to restore low power costs to such industries* and for the same general purposes for which power from project 16 was utilized....

16 U.S.C. § 836(b)(3); 19 F.P.C. 186, 194 (emphasis added). Plaintiffs assert that this language bars PASNY from setting rates for Replacement Power above its own cost of producing that power.

▉ Defendant counters that, according to a longstanding exception to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a)(2), this language is merely precatory, leaving this court "no law to apply" in determining a proper rate for Replacement Power. *Webster v. Doe*, 486 U.S. 592, 599–600, 108 S.Ct. 2047, 2051–52, 100 L.Ed.2d 632 (1988); *Heckler v. Chaney*, 470 U.S. 821, 828–31, 105 S.Ct. 1649, 1654–56, 84 L.Ed.2d 714 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Although under the APA, "[a] person suffering legal wrong because of agency action ... is entitled to judicial review thereof," 5 U.S.C. § 702, and such review should be generously provided, *Barlow v. Collins*, 397 U.S. 159, 166–67, 90 S.Ct. 832, 837–38, 25 L.Ed.2d 192 (1970), *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967),[7] parties may not obtain such review where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

This "narrow exception" was first articulated in *Overton Park*, which held that the legislative history of the APA indicated it was applicable where " 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " S.Rep. No. 752,

79th Cong., 1st Sess., 26 (1945)." *Overton Park*, 401 U.S. at 410, 91 S.Ct. at 821. It was explained in *Heckler*, which held that

> review is not to be had if the statute is drawn so that a court would have *no meaningful standard* against which to judge the agency's discretion. In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely.

*Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655 (emphasis added). *See also Webster*, 486 U.S. at 600, 108 S.Ct. at 2052.

In deciding whether a given statute provides a meaningful standard by which to review an agency's action, courts have looked to "the statutory language, the statutory structure, the legislative history, and the nature of the agency action." *Singh v. Moyer*, 867 F.2d 1035, 1038 (7th Cir.1989). *See Webster*, 486 U.S. at 600, 108 S.Ct. at 2502 (noting both *Overton Park* and *Heckler* required "careful examination of the statute on which the claim of agency illegality is based."); *New York Racing Ass'n v. N.L.R.B.*, 708 F.2d 46, 51 (2d Cir. 1983) (looking to "other indications of congressional intent: the nature of the agency action involved, the amount of expertise required, the place of the particular action and of judicial review in the overall statutory scheme governing the agency and, of course, the legislative history of the statute."); *Greater New York Hosp. Ass'n v. Mathews*, 536 F.2d 494, 499 (2d Cir.1976) (reviewing the law itself, its legislative history, and other statutes); *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 303 (2d Cir.1971). The "existence of some law generally applicable to the subject matter in question," however, may not be enough to permit review of an agency's decision. *City of Santa Clara v. Andrus*, 572 F.2d 660, 666 (9th Cir.1978). "There is 'law to apply,' only if a specific statute limits the agency's discretion to act in the manner which is challenged." *Id.*

Thus, were this doctrine applicable, the question for this court would be whether

---

7. It must be noted that the breadth of judicial review is not dependent on the APA. *See, e.g., Stark v. Wickard*, 321 U.S. 288, 307–10, 64 S.Ct. 559, 569–71, 88 L.Ed. 733 (1944); *Shields v. Utah Idaho Cent. R.R.*, 305 U.S. 177, 183, 59 S.Ct. 160, 163, 83 L.Ed. 111 (1938).

the language of the NRA, and specifically the phrase requiring PASNY to contract with Niagara Mohawk to sell 445,000 kW of power for resale to Niagara frontier industries *"in order as nearly as possible to restore low power costs to such industries,"* 16 U.S.C. § 836(b)(3) (emphasis added), coupled with the legislative history of the NRA, provides a meaningful standard to review PASNY's decision to increase its rate for Replacement Power.

 Plaintiffs argue that this doctrine is inapplicable to this case because the exception, "no law to apply," precluding judicial review of agency action, is an exception based on § 701(a)(2) of the APA. 5 U.S.C. § 701(a)(2). *See Webster v. Doe*, 486 U.S. at 599–600, 108 S.Ct. at 2051–52; *Heckler v. Chaney*, 470 U.S. at 828–31, 105 S.Ct. at 1654–55; *Overton Park*, 401 U.S. at 410, 91 S.Ct. at 820. That section states: "This chapter applies ... except to the extent that ... (2) *agency* action is committed to *agency* discretion by law." 5 U.S.C. § 701(a)(2) (emphasis added). Under the APA, " 'agency' means each authority of the Government of the United States...." 5 U.S.C. § 701(b)(1). PASNY is clearly not a federal agency. It is a corporate instrumentality of the State of New York. N.Y. Pub.Auth.Law § 1002 (McKinney 1982). Nor can it be seen to take on federal agency status by virtue of its role under the NRA. "There must be 'extensive, detailed and virtually day-to-day supervision' by the federal government before 'federal agency' status can attach to a non-federal entity." *Singleton Sheet Metal Works v. City of Pueblo*, 727 F.Supp. 579, 581 (D.Colo.1989) (citing *Forsham v. Harris*, 445 U.S. 169, 180, 100 S.Ct. 977, 984, 63 L.Ed.2d 293 (1980); *United States v. Orleans*, 425 U.S. 807, 815–16, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976)). Neither party contends that such federal supervision exists over PASNY. As a non-federal entity, therefore, the APA does not apply to it. *Munoz–Mendoza v. Pierce*, 711 F.2d 421, 430 (1st Cir. 1983); *Johnson v. Wells*, 566 F.2d 1016, 1018 (5th Cir.1978); *Singleton Sheet Metal Works*, 727 F.Supp. at 581; *Ciccone v. Waterfront Comm'n of New York Harbor*, 438 F.Supp. 55, 58 (S.D.N.Y.1977); *Birn-*

*berg v. Washington Metro. Area Transit Auth.*, 389 F.Supp. 340, 343 (D.D.C.1975).

 The court finds this argument persuasive. Judicial review is the rule, not the exception. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986); *Abbott Laboratories*, 387 U.S. at 140–41, 87 S.Ct. at 1511; *Oregon Natural Resources Council v. Mohla*, 895 F.2d 627, 629 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *City of New York v. United States Dep't of Commerce*, 713 F.Supp. 48, 53 (E.D.N.Y. 1989). Judicial review in this case is based not on the APA, but on the general grant of jurisdiction over federal questions, 28 U.S.C. § 1331, and on the express grant of jurisdiction found in the Federal Power Act:

> The District Courts of the United States ... shall have exclusive jurisdiction of violations of this chapter [under which PASNY's license was issued] or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder.

16 U.S.C. § 825p. *See DiLaura v. Power Auth. of the State of New York*, 654 F.Supp. 641, 644 (W.D.N.Y.1987); *Airco Alloys Div., Airco, Inc. v. Niagara Mohawk Power Corp.*, 65 A.D.2d 378, 411 N.Y.S.2d 460, 463 (1978). Defendant seeks to negate this review by applying an exception to judicial review clearly developed from the language and legislative history of the APA. *Webster v. Doe*, 486 U.S. at 599–600, 108 S.Ct. at 2051–52; *Heckler v. Chaney*, 470 U.S. at 828–31, 105 S.Ct. at 1654–55; *Overton Park*, 401 U.S. at 410, 91 S.Ct. at 820. As discussed above, this exception applies by definition only to the actions of *federal* agencies. PASNY is not an agency within this exception. Therefore, there is no obstacle to a review of PASNY's actions.

 Defendant cites two cases to support its claim that the "no law to apply"

doctrine also applies where state agency action is being reviewed. *Virgin Islands Hotel Ass'n v. Virgin Islands Water & Power Auth.*, 465 F.2d 1272, 1274 (3d Cir. 1972); *Delaware County Elec. Coop., Inc. v. Power Auth. of the State of New York*, 1985 WL 1620 (S.D.N.Y. June 11, 1985). Although these cases appear on point—especially the latter case which rejected a challenge to PASNY's rate-setting decisions under the NRA—neither case is compelling. *Virgin Islands* based its extension of the "no law to apply" doctrine on the reasoning of *Hahn v. Gottlieb*, 430 F.2d 1243, 1249-51 (1st Cir.1970), which held there was "clear and convincing evidence" that Congress had intended Federal Housing Authority control over rents to be committed to agency discretion. *Virgin Islands*, 465 F.2d at 1294. Under *Heckler*, however, the "clear and convincing" intent test was held to apply to bar judicial review under APA § 701(a)(1), not § 701(a)(2), from which the "no law to apply" doctrine is derived. *Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655. In *Delaware County*, there is no explanation at all for the extension of the "no law to apply" exception to a state agency's action. A search by the court found no other cases similarly precluding review of state agency action. The court therefore declines to extend this APA-based exception to this case. *See* K. Davis, ADMINISTRATIVE LAW TREATISE § 28.16 (1982 Supp.); K. Davis, *"No Law to Apply,"* 25 San Diego L.Rev. 1 (1988); C. Koch, *Judicial Review of Administrative Discretion*, 54 Geo.Wash.L.Rev. 469, 497–99 (1986).

Accordingly, defendant's motion to dismiss the complaint on this ground is denied.

## II. ABSTENTION

Defendant alternatively argues that this court should abstain from exercising its jurisdiction for reasons of comity. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *Burford* involved a suit by the Sun Oil Company challenging the validity of an order of the Texas Railroad Commission granting Mr. Burford a permit to drill oil wells on his property in East Texas. The suit alleged violations of due process, as well as state law, and was in federal court upon diversity grounds. The Court held that, given the extensive state regulatory scheme for maximizing oil production in Texas, a scheme thoroughly reviewable in state court, and the relative unimportance of the federal constitutional claims, the federal court should abstain. *Id.* at 334, 63 S.Ct. at 1107. The elements of the *"Burford* doctrine" have recently been reiterated by the Court.

> Where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) ("NOPSI II") (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)).

Plaintiffs argue that this case does not fit under either of these categories. Although defendant argues extensively that this court should apply *Burford, see* GM Item 10, at 15–25; GM Item 13, at 19–30, their argument can be readily dismissed by a reading of *NOPSI II.* The issue in this case is not whether PASNY has properly applied New York's complex ratemaking regulations, *see NOPSI II*, 491 U.S. at 360, 109 S.Ct. at 2513 (citing *Burford*, 319 U.S. at 331 & n. 28, 63 S.Ct. at 1106 & n. 28), or where the success of plaintiffs' claim depends upon the " 'predominately local factor of public need for the service rendered.' " *NOPSI II*, 491 U.S. at 361, 109 S.Ct. at 2514 (quoting

*Alabama Pub. Serv. Comm'n v. Southern Railway Co.,* 341 U.S. 341, 347, 71 S.Ct. 762, 767, 95 L.Ed. 1002 (1951)). As with *NOPSI II,*

> The present case does not involve a state law claim, nor even an assertion that the federal claims are 'in any way entangled in a skein of state law that must be untangled before the federal case can proceed.'

*NOPSI II,* 491 U.S. at 361, 109 S.Ct. at 2514 (quoting *McNeese v. Board of Educ. for Community Unit School Dist. 187,* 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963)). The issue in this case is solely *federal:* whether Congress, in directing PASNY to be licensed to construct and operate the Niagara power project under the NRA, also intended to authorize PASNY to prescribe rates for Replacement Power sold under the statute.

Defendant's argument that "courts have traditionally recognized that local utility ratemaking is a matter of substantial concern to the states," GM Item 10, at 17–20, thus merely begs the central question of this case, whether Congress under the NRA intended the rates for Replacement Power to be a matter of local discretion. Again, this is a federal question first. "[N]o inquiry beyond the four corners of" PASNY's rate order is needed to determine whether it violates the NRA or its license issued thereunder. *NOPSI II,* 491 U.S. at 363, 109 S.Ct. at 2515.

 Finally, defendant's argument that state proceedings would be adequate to address plaintiffs' claims also fails. The state proceedings identified by defendant, GM Item 10, at 23–26; GM Item 13, at 28–30, simply do not address the federal questions posed by this case. *See, e.g., Airco Alloys Div., Airco, Inc. v. Niagara Mohawk Power Corp.,* 65 A.D.2d 378, 411 N.Y.S.2d 460, 464–65 (1978) (specifically distinguishing state contractual claim from federal claim, and granting jurisdiction only under the former). Moreover, the Federal Power Act, 16 U.S.C. § 791a *et seq.,* provides for *exclusive* federal jurisdiction over "violations of this chapter or the rules, regulations, and orders thereun-

der...." 16 U.S.C. § 825p. Thus, at least with respect to plaintiffs' second cause of action—alleging that PASNY's rate increase violated its FPC licensing order—there could be no adequate state review.

Accordingly, defendant's motion to dismiss plaintiffs' federal claims is denied.

## III. PENDENT STATE CLAIMS

Given the denial of defendant's motion to dismiss plaintiffs' federal claims, defendant's motion to dismiss plaintiffs' state claims is also denied.

A telephone conference shall be held on March 26, 1991, at 2 p.m. to set a further schedule.

So ordered.