990 F.2d 726
 Util. L. Rep. P 13,933
OCCIDENTAL CHEMICAL CORPORATION, the Pillsbury Company,
General Mills, Inc., Bethlehem Steel Corporation,
Nabisco Brands, Inc., Union Carbide
Corporation, Plaintiffs-Appellants,
v.
POWER AUTHORITY OF the STATE OF NEW YORK, Defendant-Appellee.
 Nos. 331, 332, Dockets 92-7526, 92-7528.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 19, 1992.
Decided April 12, 1993.
 
 Earle H. O'Donnell, Washington, DC (John D. Sharer, Steuart H. Thomsen, Nicholas T. Christakos, Sutherland, Asbill & Brennan, of counsel), for plaintiff-appellant Occidental Chemical Corp.
 Kevin A. Ricotta, Buffalo, NY (Connors & Vilardo, of counsel), for plaintiff-appellant The Pillsbury Co.
 Algird F. White, Jr., Albany, NY (Barbara S. Brenner, Couch, White, Brenner, Howard & Feigenbaum, of counsel), for plaintiffs-appellants General Mills, Inc., Bethlehem Steel Corp., Nabisco Brands, Inc. and Union Carbide Corp.
 Arthur T. Cambouris, New York City (Charles M. Pratt, Sarah J. Berger, Ann M. Quigley, Michael A. Oxman, Sharon M. Porcellio, Lippes, Silverstein, Mathias & Wexler, Buffalo, NY, of counsel), for defendant-appellee.
 Before: OAKES, NEWMAN and MAHONEY, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 On appeal, six Niagara-area customers of the Power Authority of the State of New York ("PASNY") argue that the language, legislative history and purpose of the Niagara Redevelopment Act ("NRA"), 16 U.S.C. §§ 836-836a (1988), require PASNY to sell so-called Replacement Power from the Niagara hydroelectric project to them at a rate equal to PASNY's cost of production. Accordingly, these customers--large, industrial, long-time, low-cost power consumers--argue that the construction of the statute by the District Court for the Western District of New York, John T. Curtin, Judge, set forth in an opinion reported at 786 F.Supp. 316 (W.D.N.Y.1992), is erroneous and that, therefore, the summary judgment granted to PASNY on their complaint for declaratory relief should be reversed. We disagree and affirm.
 
 
 2
 Judge Curtin's opinion, his grasp of the complex underlying history,[1] his analyses of the statutory phraseology, the legislative give-and-take, and the ideas and aims of the Congressional approach toward development of the enormous, continual hydro flow of the Niagara River, after the United States-Canada boundary water treaty signed in 1950, 1 U.S.T. 694, and after the June 7, 1956 rock slide that destroyed the Niagara Mohawk Power Corporation's ("Niagara Mohawk") 365,000 kw Schoellkopf Station, display a mastery of the subject matter that would warrant in most circumstances, despite our intensive review, an affirmance on his opinion. The importance of the case, coupled with one or two new arguments on appeal--or at least arguments not completely addressed in the opinion--necessitate, however, a few comments on our part.
 
 
 3
 Appellants are six industries who have benefited from the third condition to the license issued under the Federal Power Act, 16 U.S.C. § 791a et seq. (1988), to PASNY to construct and operate the Niagara River hydroelectric project. That condition required PASNY, with the New York governor's approval, to sell to Niagara Mohawk "for a period ending not later than the final maturity date of the bonds initially issued to finance" the project, 445,000 kw of project power (called "Replacement Power")
 
 
 4
 for resale generally to the industries which purchased power produced by [the destroyed project] prior to such date, or their successors, in order as nearly as possible to restore low power costs to such industries and for the same general purposes for which power from [the destroyed project] was utilized....
 
 
 5
 16 U.S.C. § 836(b)(3) (1988) (emphasis added).
 
 
 6
 As Judge Curtin appropriately pointed out, the "ending not later than" language indicates, first, that when the maturity date on the initial PASNY project bonds is reached, as it will be in 2006, the Replacement Power will no longer exist as such and, second, that PASNY and Niagara Mohawk could have contracted for a shorter time. Occidental Chem. Corp., 786 F.Supp. at 323. Appellants construct their argument for requiring PASNY to sell at cost or, more precisely, at PASNY's cost of production, on the further language of the same statute that the purpose of requiring the sale and resale of Replacement Power was "as nearly as possible to restore low power costs to such industries...." 16 U.S.C. § 836(b)(3) (1988). But as Judge Curtin noted, this reading is "quite contrived." Occidental Chem. Corp., 786 F.Supp. at 325. The words of the statute are "costs to such industries," not PASNY's "costs." Id. at 326. Thus, the phrase "restore low power costs" refers to the pre-1956 three-mill rate charged by Niagara Mohawk to the industries and not to Niagara Mohawk's cost of producing that power (which was in fact about fifty percent of that rate, id. at 327).
 
 
 7
 As the district court observed, see Occidental Chem. Corp., 786 F.Supp. at 326, Congress in other hydroelectric power statutes has used much more explicit language to indicate that power is to be sold at cost. See Falcon Dam on the Rio Grande Act of 1954, 68 Stat. 255 (1954) ("Rate schedules shall be drawn having regard to the recovery ... of the cost of producing and transmitting such electrical energy."); Flood Control Act of 1944, 16 U.S.C. § 825s (1988) (same). In Power Authority of the State of New York v. FERC, 743 F.2d 93 (2d Cir.1984), we noted that if Congress had wanted to accomplish a specific restriction in the NRA (restricting resale from the municipal utilities to domestic and rural consumers), "it could easily have done so simply by stating" that restriction. Id. at 104. The same observation applies here. Congress easily could have specified "at-cost power," or rates based on "cost," had that been its intent.
 
 
 8
 Appellants' reliance on legislative history equally founders. They especially emphasize the April 11, 1957 statement of PASNY General Counsel Moore, made before a subcommittee of the Senate Committee on Public Works in response to a question by Senator John A. Carroll of Colorado, as follows:
 
 
 9
 MR. MORRE: No. Under the law that Senator Javits told you about, that established the power authority [the Power Authority Act] the power authority is mandated to sell power at cost. That is all. We don't make any profit. Nobody makes any profit. And it will continue to be sold as long as we are in business.
 
 
 10
 SENATOR CAROLL: That is a very important point. I didn't understand that.
 
 
 11
 Development of Power at Niagara Falls, N.Y.: Hearings on S. 512 and S. 1037 Before the Subcomm. on Flood Control and Harbors of the Senate Committee on Public Works, 85th Cong., 1st Sess. 175 (April 11, 1957) ("Senate Hearings") (quoted in Occidental Chem. Corp., 786 F.Supp. at 329 n. 20). That statement--whatever weight it may be entitled to as a matter of law, a question quite fully explored by Judge Curtin, id. at 329--must be read in context. The question calling it forth pertained not to the Niagara power project but to the St. Lawrence power project and referred to the pay-out period of 35 years on the $335 million of bonds issued by PASNY to start that project. The question was "[w]hen the pay-out period is over, do the revenues go to the New York State Authority [PASNY]?" Senate Hearings, supra, at 175. Judge Curtin quite properly concluded that the statement by General Counsel Moore simply was to differentiate PASNY, a non-profit corporation, from private utility companies that pay a rate of return to investors, and not that power sold by PASNY was to be sold at cost to it. Occidental Chem. Corp., 786 F.Supp. at 329-30 & n. 20. This, the judge pointed out, was especially consistent with the fact--conceded by the appellants--that PASNY by law need not market many other classes of power it sells "at cost," a fact which was well known to General Counsel Moore. See N.Y.Pub.Auth. Law § 1005(5) (McKinney's 1982).
 
 
 12
 Judge Curtin's accurate treatment of the Moore statement is also supported by the context of the entire April 11, 1957 discussion before the Senate Committee at the time. That discussion related to the so-called federal preference clause, whereby neighboring states within an economic transmission distance (particularly those states' municipal and cooperative, i.e., non-profit, utilities) were given as to St. Lawrence (and ultimately as to Niagara) project power a preference, the terms of which were subject to PASNY-neighboring state negotiation. See Senate Hearings, supra, at 154-178.
 
 
 13
 Judge Curtin's conclusions from the statute and the legislative history are compelling. To this court it is clear that
 
 
 14
 Congress's main concern in providing low-cost power to industry in the Niagara region was to avoid economic dislocation should such industry be forced to move their operations in search of lower-cost power. This concern has been satisfied. Industry has not moved from the Niagara region because, even with the higher rates so far implemented by PASNY, Replacement Power is still apparently the cheapest firm industrial power in the United States, and by a wide margin. Until Replacement Power rates were increased for the first time in January, 1990, the effects of inflation had steadily diminished the cost to industry of Replacement Power. At the end of 1989, Replacement Power cost industry just thirty-five percent in real terms of what it cost industry in 1961. See Item 39, p 61. Meanwhile, other industrial rates charged Niagara area industries continued to increase, such that even at the 1992 rate of approximately one cent per kWh, Replacement Power cost less than one-sixth the rate charged to Niagara Mohawk's other industrial customers in the Niagara area.
 
 
 15
 Occidental Chem. Corp., 786 F.Supp. at 330.
 
 
 16
 Judge Curtin fully addresses all other arguments raised by appellants.
 
 
 17
 Accordingly, the judgment is affirmed.
 
 
 
 [1]
 See Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 100-05, 80 S.Ct. 543, 545-47, 4 L.Ed.2d 584 (1960); Occidental Chem. Corp. v. Power Auth. of the State of N.Y., 758 F.Supp. 854, 856-57 (W.D.N.Y.1991) (prior order herein)